**Ivar ISAKSON et al., Appellants,**

**v.**

**Roy RICKEY et al., Appellees.**

**No. 2550.**

Supreme Court of Alaska.

May 21, 1976.

Randall J. Weddle, Faulkner, Banfield, Doogan & Holmes, and James F. Clark, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellants.

Avrum M. Gross, Atty. Gen., and Rodger W. Pegues, Asst. Atty. Gen., Juneau, for appellees.

Before RABINOWITZ, CONNOR, ERWIN and BURKE, Justices, and DIMOND, Justice Pro Tem.

## OPINION

ERWIN, Justice.

This appeal involves a challenge to a section of Alaska's Limited Entry Act, AS 16.43.010 et seq., which was enacted by the State Legislature in 1973. The Act created the Alaska Commercial Fisheries Entry Commission and a scheme for precluding entry of some fishermen into the Alaska commercial fisheries. Appellants, all Alaska commercial fishermen, contend that a certain provision of the Act denies them equal protection of the laws and is therefore unconstitutional.

A brief review of the history of limited entry in Alaska is necessary to understand the positions of the litigants.

In the past, entry into commercial fishing was relatively easy because the industry provided inexpensive financing for boats and gear. As a consequence even people engaged in other primary employment could obtain the funds necessary to begin fishing commercially and, because it was not the major source of their livelihood, could afford to participate at marginal economic levels.[1]

Since 1960, the commercial use of the various authorized gear used for taking fish has required a gear license. While more than one person could participate in operating a given unit of gear, i. e., partners, crewmen, spouses or children, each unit engaged in commercial fishing generally had but one gear license. Accordingly, the number of gear licenses actively in use represented the number of units of gear actually engaged in any fishery. Between 1960 and 1972, the number of units of gear licensed in the Alaska salmon fisheries increased from 6,512 to 11,363. Thus, while the supply of salmon decreased, the fishing effort measured by the number of units of gear operating in the fisheries increased significantly.

The commercial fisheries are unquestionably an important economic resource of the State. To maintain the maximum biological and the optimum economic sustained yields for those engaged in commercial fishing, it became apparent that some action was necessary.

In August, 1972, the people of Alaska voted overwhelmingly to amend the State Constitution to permit the adoption of a limited entry program for the commercial fisheries.[2] In January of 1973, the Governor proposed legislation for a limited entry program to the state legislature. As introduced, the bill required entry permits in order to operate gear after January 1, 1974. The Alaska Commercial Fisheries Entry Commission was established under the bill to determine who would receive the limited number of permits, with selection to be based upon certain hardship standards, e. g., degree of economic dependence on the fishery and extent of past participation in the fishery. It was specifically provided that those who received the entry permits could subsequently sell them at fair market value.[3]

With regard to who could submit applications, the original bill provided that the "commission shall establish the opening and closing dates, places and form of applica-

---

1. *See* Governor's Study Group on Limited Entry, A Limited Entry Program for Alaska's Fisheries, 270–71 (1973).

2. Art. VIII, § 15 of the Alaska State Constitution provides:
   No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them, for a livelihood and to promote the efficient development of aquaculture in the State.

3. AS 16.43.170.

tion for entry permits. . . . "[4] When the bill was before the legislature, it was modified so that only holders of gear licenses could apply for the entry permits. Finally, just prior to being sent to the Governor for approval, the bill was again changed to read:

> The commission shall accept applications for entry permits only from applicants who have harvested fishery resources commercially while participating in the fishery as *holders of gear licenses* issued under AS 16.05.536–16.05.670, *before January 1, 1973*. (Emphasis added)

The case at bar concerns this added provision, hereinafter referred to as AS 16.-43.260(a).[5]

The plaintiffs in the action below (and the appellants herein) became holders of gear licenses after January 1, 1973. These plaintiffs sought a declaratory judgment, a preliminary injunction, and a permanent injunction against the Commercial Fisheries Entry Commission (appellees herein) to prevent enforcement of the Act. The plaintiffs argued, among other things, that the cut-off date of January 1, 1973, which prevented them from submitting an application for a free commercial fishing entry permit, denied them equal protection of the laws. Following a hearing, the motion for a preliminary injunction was denied and cross motions for summary judgment were filed. The trial court granted appellees' motion for summary judgment.

The plaintiffs below appeal the trial court's decision, contending that the date utilized in AS 16.43.260(a) violates the equal protection clause of the Fourteenth Amendment to the United States Constitution which prohibits states from denying "to any person within its jurisdiction the equal protection of the laws," and under

the similar provision of the Alaska Constitution, art. I, § 1. Specifically, appellants argue that the legislature devised the January 1, 1973, cut-off date to facilitate the Commission's selection process by eliminating those applicants whom they believed would be unable to demonstrate the hardship necessary for an entry permit. From this base they submit that the January 1, 1973, date results in a classification which is overbroad and underinclusive. Appellants point out that a person who has retired or discontinued commercial fishing prior to January 1, 1973, is allowed to apply for a free permit regardless of the degree of hardship he would suffer by being excluded from the fisheries simply by virtue of fortuitously holding a gear license before the cut-off date. On the other hand, persons such as appellants, are precluded from even submitting an application because they became gear license holders after January 1, 1973. This is so despite the fact that they have engaged in commercial fishing endeavors in previous years and have invested large amounts of money in gear and vessels with the intention of fishing commercially for a living in the future. Thus, they submit, the classification is unconstitutional.

In the past this court has applied the traditional tests in analyzing equal protection problems. Thus, previous cases have spoken in terms of the "rational basis" test and the "compelling state interest" test, depending on whether or not the right sought to be regulated was fundamental in a constitutional sense or involved a suspect classification. Too often, however, the label applied preordained the outcome of the case. Because of this fact, recent decisions by this court noted a growing dissatisfaction with the two-tiered test.

---

4. H.B. 126, 8th Leg., 1st Sess. (1973).

5. Section 16.43.260 was amended in 1974 and now provides:
   The commission shall accept applications for entry permits only from applicants who

have harvested fishery resources commercially while participating in the fishery as holders of gear licenses issued under AS 16.05.536–16.05.670 before the qualification date established in (d) or (e) of this section.

In *State v. Wylie*,[6] we observed:

Several recent decisions of the Supreme Court of the United States have evidenced discontent with the strict scrutiny standard called for by the "compelling state interest" test and the "minimal scrutiny" resulting from employment of the "rational basis" criteria. For an analysis of this development see Professor Gunther's foreword to The Supreme Court, 1971 Term. 86 Harv.L.Rev. 1, 17–24 (1972).

In *State v. Adams*[7] we cited the above passage from *Wylie* and recognized that the United States Supreme Court "may be searching for a new equal protection analysis."

In a subsequent opinion, *Lynden Transport, Inc. v. State*,[8] we wrote:

It has been suggested that there is mounting discontent with the rigid two-tier formulation of the equal protection doctrine, and that the United States Supreme Court is prepared to use the clause more rigorously to invalidate legislation without expansion of "fundamental rights" or "suspect" categories and the concomitant resort to the "strict scrutiny" tests. We are in agreement with the view that the Supreme Court's recent equal protection decisions have shown a tendency towards less speculative, less deferential, more intensified means-to-end inquiry when it is applying the traditional rational basis test and we approve of this development.

■ Finally, in *Ravin v. State*,[9] the court quoted the foregoing passage from *Lynden Transport*, and, in addition, noted that "[t]his court has previously applied a test different from the rigid two-tier formulation to state regulations."[10] The different test was enunciated in *Wylie v. State*[11], despite the fact that we utilized the "compelling state interest" standard therein because the constitutional right to travel was affected by the legislation. In *Wylie* we articulated a "rational basis" test which was more demanding than the standard used in previous cases. Citing two United States Supreme Court cases[12] in which the rational basis standard was applied in a fairly rigorous, non-deferential way we wrote:

Under the rational basis test, in order for a classification to survive judicial scrutiny, the classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."[13]

It is this more flexible and more demanding standard which will be applied in future cases if the compelling state interest test is found inappropriate. As a result, we will no longer hypothesize facts which would sustain otherwise questionable legislation as was the case under the traditional rational basis standard. Thus, under the new test

Judicial deference to a broad range of conceivable legislative purposes and to imaginable facts that might justify classifications is strikingly diminished. Judicial tolerance of overinclusive and underinclusive classifications is notably reduced. Legislative leeway for unexplained pragmatic experimentation is substantially narrowed.[14]

6. 516 P.2d 142, 145 n. 4 (Alaska 1973).

7. 522 P.2d 1125, 1127 n. 12 (Alaska 1974).

8. 532 P.2d 700, 706–07 n. 10 (Alaska 1975).

9. 537 P.2d 494 (Alaska 1975).

10. *Id.* at 498.

11. 516 P.2d 142 (Alaska 1973).

12. *F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990–91 (1920); *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225, 229 (1971).

13. 516 P.2d 142, 145 (Alaska 1973).

14. Gunther, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for Newer, Equal Protection, 86 Harv.L.Rev. 1, 20 (1972).

This new standard will, in short, close the wide gap between the two tiers of equal protection by raising the level of the lower tier from virtual abdication to genuine judicial inquiry.

■ The threshold determination, then, is whether the compelling state interest test is applicable herein. In view of the fact that we do not consider the classification in question to be suspect and do not consider the right to a limited entry permit to be a fundamental right, the state will not be held to the higher standard in this case. Instead, we shall apply the new rational basis standard.

Therefore, the question presented is whether the circumstance of holding a gear license before January 1, 1973, bears a fair and substantial relation to the purpose sought to be advanced by AS 16.43.260(a), when examining intensively the means used and the reasons advanced therefor.

In applying this modified rational basis test, we must first look at the purpose of the challenged legislation. We note at the outset that the only committee reports which would provide an insight into the legislative history of AS 16.43.260(a) are inconclusive on the purpose of the legislation. This is understandable in view of the fact that the official records reflect that the January 1, 1973, cut-off date was a last minute change. We can, however, look to the statement of purpose of the Alaska Limited Entry Act itself upon the assumption that the provision was enacted to further that expressed purpose.[15] AS 16.43.010 provides as follows:

> It is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination.

To implement this policy, only holders of an entry permit would be allowed to operate gear for commercial fishing after January 1, 1974.[16] To avoid unjust discrimination the Act instructed the Commission to rank applicants for the limited number of permits "according to the degree of hardship which they would suffer by exclusion from the fishery."[17]

As previously noted, the bill as originally introduced by the Governor placed no limitation on prospective applicants; later, however, the legislature added the provision requiring that an applicant be a gear license holder. As appellees point out, because there was no deadline set for submitting applications, the bill encouraged fishermen to become gear license holders before the cut-off date was ultimately determined by the Commission. The figures indicate that this was indeed the case; applications for gear licenses during the first months of 1973 increased significantly over past years.[18]

Appellees contend that it was this rush for gear licenses which provoked the legislature to insert the contested provision that only holders of gear licenses issued before January 1, 1973, could submit applications to the Commission for an entry permit. They maintain that this justifies the classification. This argument assumes that more gear licenses meant more gear in already depleted fisheries, and that a heavy influx of gear into certain areas before entry permits were required in January of 1974 would result in detrimental economic and biological ramifications. While we agree with these assumptions, it is our view that the means for stopping the gear rush and its consequent harmful effects was

15. *See State v. City of Anchorage*, 513 P.2d 1104, 1110 (Alaska 1973); *State v. American Can Co.*, 362 P.2d 291, 296 (Alaska 1961).

16. AS 16.43.140.

17. AS 16.43.250(a).

18. By April 20, 1973, applications for gear licenses for trolling were up 148%, for drift gillnet 57%, and for purse seine 42%, over applications for the same period in 1972.

accomplished by a provision already in the Act.

The legislature had previously inserted the provision that hardship would be determined as of January 1, 1973.[19] Certainly few fishermen would be inclined to invest unnecessarily in gear if they were aware of the fact that it would not be considered by the Commission when entry permits were ultimately issued on the basis of hardship. This provision would clearly halt the gear rush that was taking place, thus obviating any potential harm to the fishing industry before entry permits were required on January 1, 1974.

■ In view of the fact that a provision inserted prior to the one in question prevented the gear rush, we do not think that the legislature would add another provision to accomplish the same purpose. Indeed, to do so would be to disregard the rule of statutory construction that each section of a statute is presumed to serve some useful purpose.[20]

■ When the Act is viewed as a whole, it becomes apparent that the contested provision was inserted because it was assumed that those persons who obtained gear licenses after January 1, 1973, would be unable to demonstrate the requisite hardship for an entry permit. Hence, for the sake of administrative convenience, it was decided that they need not even submit applications to the Commission. In essence, the purpose of the provision was to segregate hardship and non-hardship cases at the application phase of the permit issuance process.

In his dissent, Justice Connor takes the position that the purpose of AS 16.43.260 (a) was to alter the basic criteria by which initial free limited entry permits were to be allocated. In his view, the legislature intended these permits to go only to prior

gear license holders who could demonstrate the requisite degree of hardship. We find the interpretation unpersuasive. The legislative history rather clearly demonstrates that from the outset the framers of this legislation intended "hardship" to be the determinative factor.[21] In the bill originally submitted by the Governor there was no restriction on the nature or number of applications which the Commission would entertain.[22] The challenged section, AS 16.43.260(a), was inserted at a late stage in the legislative process, and nothing in the committee records marshalled by the parties in the case at bar suggests an awareness of intent that AS 16.43.260(a), as revised, would alter the statute's central allocation criteria.

The legislative history cited by our dissenting colleague does not contradict this interpretation but in fact confirms it. As pointed out in footnote 4 of the dissent, the original draftsmen intended that past participation in the fishery would be one of the criteria for determining hardship. In other words, some preference would be given to "[t]hose people who have fished the most." [23] In explaining this criteria, the draftsmen said:

> The commission will also consider the extent of a person's past participation in the fishery. . . . A person who fished for 10 years would get a higher priority consideration than a person who fished four weekends a year for 10 years.
>
> Past participation *as a commercial fisherman in any capacity will be considered, not just past participation as a licensed gear operator.*[24]

The draftsmen also made clear in the very first version of the Act that the purpose of this legislation was to regulate entry into the commercial fisheries "without unjust discrimination." [25] The report of

---

19. AS 16.43.260(d).

20. *See* Sands, Sutherland Statutory Construction, Vol. 2A, § 4606, p. 63 (4th Ed.1973).

21. *Id.* at 1.

22. *Id.*

23. *Id.* at 1.

24. *Id.* at 7 (emphasis added).

25. *Id.* at 295.

the Governor's Study Group evidences their understanding that license ownership had no real bearing on any of the substantive criteria by which entry permits were to be allocated—economic dependency, past participation, and present intention to participate. Having proposed legislation which sought to allocate entry permits in accordance with the realities of the fishing profession—i. e., according to degree of individual hardship—they doubtless would have regarded allocation based in part on license ownership precisely as "unjust discrimination." Inasmuch as the policy against discrimination was retained throughout the passage of the Act, it seems incongruous that the legislature would have decided to revise the fundamental allocation criteria in the legislation without debate or discussion, making that intention explicit. For these reasons we are of the view that AS 16.43.260(a) was not intended to modify the allocation policy of the legislation, but rather was adopted to further that policy by simplifying the ranking process.

■ Thus the question presented to this court is: does holding a gear license before January 1, 1973, bear a fair and substantial relation to the purpose of the legislation, which is the segregation of hardship and non-hardship cases? In our opinion, it does not.

AS 16.43.260(a) precludes fishermen from applying for an entry permit unless they were gear license holders before January 1, 1973. As a result, many fishermen are automatically excluded from receiving entry permits, even though they might be able to demonstrate significant hardship by exclusion due to economic dependence upon the fishery. On the other hand, there is no requirement that persons applying for permits demonstrate that they were active fishermen dependent upon the fisheries, on or near the cut-off date. Hence, many people are allowed to apply for permits although they have long since sold their vessel and gear, retired from commercial fishing, and have no intention of fishing in the future.

Because persons such as appellants are automatically excluded from the class eligible to apply for permits, in spite of active participation and economic dependence upon the fishery, the January 1, 1973, classification is under-inclusive with respect to persons allowed to apply for permits. Because persons who have long since retired and have no economic dependence upon the fishery as of the cut-off date are allowed to apply for entry permits, the classification is overbroad with respect to those allowed to apply.

In essence, the January 1, 1973, cut-off date created an irrebuttable presumption [26] that no one acquiring a license after that time could suffer the requisite hardship necessary for an entry permit. Yet a number of people in that class would be able to demonstrate substantial indicia of hardship as a result of their exclusion from commercial fishing. Appellants, for example, show both previous participation and objective manifestations of future intent to participate in the industry. Procedure by presumption is always easier than individualized determination. But when, as here, the procedure forecloses the determinative issue of hardship, it needlessly risks running roughshod over the important interests of the fisherman whose livelihood is at stake. This must not be allowed to happen; indeed, the equal protection clause was designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that is often characterized in the most praiseworthy legislation.[27]

---

26. *U. S. Department of Agriculture v. Murry*, 413 U.S. 508, 512–14, 93 S.Ct. 2832, 2835, 37 L.Ed.2d 767, 772–73 (1973); *Vlandis v. Kline*, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236–37, 37 L.Ed.2d 63, 71 (1973); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 651, 94 S.Ct. 791, 801, 39 L.Ed. 2d 52, 66 (1974); *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed. 2d 551, 561 (1972).

27. *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551, 562 (1972).

We find that AS 16.43.260(a) violates appellants' equal protection rights guaranteed by the state and federal constitutions.[28] Therefore, the decision of the superior court is reversed, and this case is remanded with instructions to enter a judgment for appellants.

BOOCHEVER, C. J., not participating.

CONNOR, Justice (dissenting).

I respectfully dissent.

As I interpret the legislative purpose, it was to freeze or reduce the amount of gear used in overcrowded fisheries.[1] The statute as passed gives a free entry permit to a portion of those persons who had held a gear license previously,[2] that portion to

be determined on the basis of hardship.[3] Those who have never held gear licenses, even if they have fished as crew members, will not receive free entry permits. This will not prevent them from continuing as crew members. See AS 16.43.140(b). It only prevents such individuals from advancing to the point of operating new units of gear, until and unless someone already operating gear ceases doing so and transfers his license, no doubt in return for a cash payment. See AS 16.43.170; AS 16.-43.180. Fishermen who have previously been issued a gear license but have since retired, and hence who do not represent an existing unit of gear, will presumably be excluded under the second-stage "hardship" screening of AS 16.43.250.[4] While

---

**28.** We are not, however, declaring that the entire Act violates the Federal and Alaska equal protection clauses.

**I.** Governor Egan's Study Group on the limited entry program actually indicated that the purpose was to cut down on the amount of gear used, not merely freeze it at current levels. See Governor's Study Group on Limited Entry, A Limited Entry Program for Alaska's Fisheries 1 (1973).

**2.** AS 16.43.260(a) as amended in Ch. 126, S.L.A.1974, provides:

"(a) The commission shall accept applications for entry permits only from applicants who have harvested fishery resources commercially while participating in the fishery as holders of gear licenses under AS 16.05.-536–16.05.670 before the qualification date established in (d) or (e) of this section."

Subsections (d) and (e) as enacted provide:

"(d) Except as provided in (e) of this section, an applicant shall be assigned to a priority classification based solely upon his qualifications as of January 1, 1973."

"(e) When the commission establishes the maximum number of entry permits for a particular fishery under § 240 of this chapter after January 1, 1975, an applicant shall be assigned to a priority classification based solely upon his qualifications as of January 1 of the year during which the commission establishes the maximum number of entry permits for the fishery for which application is made."

Subsection (d) was itself part of the amendment package passed in response to the gear rush. Subsection (a) as originally passed provided that in order for an applicant to be

eligible to apply he must have held his gear license before January 1, 1973.

**3.** See AS 16.43.250.

**4.** The Governor's Study Group on Limited Entry, in proposing this legislation, listed three criteria to be used in selecting which fishermen "will remain in the fishery".

"—Those people who most depend upon the fishery for all or a major part of their livelihood;

—Those people who have fished the most in the past; and

—Those people who are ready, willing and able to fish actively now."

Governor's Study Group on Limited Entry, A Limited Entry Program for Alaska's Fisheries 1 (1973).

The second of these indicates that a "prior appropriation" type criterion was clearly adopted by the Study Group. At that time —before the gear rush—the Study Group already indicated that "anyone who has not held a gear license for some period may have difficulty qualifying under this Standard" but then provided that one who had held a gear license for a limited amount of time while working as a full-time professional crewman for many years might qualify ahead of a "casual weekender" who had held a gear license for a longer priod of time. Id., at 7. The other two factors to be considered would not, in the Study Group's opinion, make up for any lack of "past participation".

"For fairness to everyone involved, these three standards are all necessary to provide the basis for adopting specific rules deciding who will remain in the fishery. The absence of any one would be like taking a leg from a milking stool." Id., at 17.

not perfect, this scheme appears to bear a fair and substantial relationship to the legislative purpose of freezing or reducing certain fisheries—that is, prohibiting advancement or new entry by fishermen who put more gear in the water and take more fish out.

Such an approach to distributing a scarce resource has been widely used in other contexts. For example, a state is not prohibited from implementing a change to "prior appropriation" doctrine in water law. *Connecticut v. Massachusetts*, 282 U.S. 660, 670, 51 S.Ct. 286, 75 L.Ed. 602 (1931); *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 702–03, 19 S.Ct. 770, 43 L.Ed.2d 1136 (1899).[5]

This, then, is the content and purpose of the statute as it passed the legislature in 1973. During the course of passage, certain members of the public, upon receiving news that a limited entry bill was proposed, rushed to purchase gear licenses in the early months of 1973, apparently in an attempt to "grandfather" themselves into the new law. The increase in license applications was unprecedented, averaging as high as 75% in March, and soaring to 148% for trolling licenses for the period between January 1st and April 20th.[6] Thus it became apparent that many people who had never had gear licenses before were now attempting to move up in the world—a result antithetical to the freeze envisioned by the legislature.[7]

Thus it is not at all surprising that the legislature decided to increase the importance placed upon a potential applicant's prior ownership of a gear license as a means of preventing advancement within the industry. This was in keeping with the general priority policies already inherent in the proposed statutory scheme.

The majority's conclusion that "hardship" alone as a criterion can weed out unworthy newcomers misses the point. As noted above, a constitutionally permissible "prior use" principle is manifested in the bill as finally passed, apart from the concept of unmodified hardship. "Hardship" as defined in AS 16.43.250(a)(2) includes consideration of "past participation in the fishery." That the legislature should, in the light of the 1973 gear rush, have decided to place a stronger emphasis upon this factor as it relates specifically to gear license holders, and not mere ambitious crewmen, offspring or unlicensed part-owners, is not unconstitutional in light of a legislative purpose to freeze these other individuals into their positions in order to protect the economics and ecology of the industry. For such individuals to acquire their own gear and licenses is either to allow more gear in the water, or to freeze out previous owners of gear and licenses. But freezing out previous owners violates the "prior use" concept; the legislature may well have considered it "unjust discrimination" under AS 16.43.010, in that it unfairly discrimi-

It must be emphasized that the Study Group's concept does not appear to have been to "grandfather in" those who were in the fishery, since the purpose was to cut down on that number. Instead, the apparent intent was to "grandfather out" newcomers from consideration for the limited places available. That is, of course, exactly the result of the application time bar found objectionable by the majority opinion.

5. The state in the case at bar has not "taken" any vested rights in fish for which compensation must be paid. *See generally* Annot., 56 A.L.R. 277, 279–80 (1927), and cases cited therein. The ownership of fish not reduced to possession lies in the state as trustee for all its citizens. *Geer v. Connecticut*,

161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1869); *see* Alaska Const. art. VIII, § 3.

6. This should be compared with an overall decrease of 2% between 1971 and 1972, and a 0.9% increase between 1970 and 1971.

7. It is even possible that, for those fisheries to be later designated by the commission, a large present influx of gear licenses might make it politically and practically impossible to reduce the number of license holders to an economically and ecologically sound level, regardless of the theoretical powers of the commission in this regard under AS 16.43.240 (b). It must be within the power of the legislature, and not the courts, to balance the practical politics involved and make such a determination.

nates against those who previously held licenses. The majority's equation of a lack of "unjust discrimination" with only "hardship" determinations is totally unjustified. If that had been the case, then I fail to see why the legislature used two different terms for the same concept. I would find instead that a lack of "unjust discrimination" encompasses both the "hardship" and "prior use" principles.

The legislature decided to cover the "gear rush" situation by painting with a broad brush. It made ineligible all would-be applicants who had not obtained their gear license before January 1, 1973, and widely publicized the fact that newly acquired gear licenses would be of no aid in obtaining entry permits thereafter. For initially "distressed fisheries" it also made hardship determinations depend solely on an applicant's qualifications as of January 1, 1973. *See* AS 16.43.260(d), quoted in note 1 *supra*. Although appellants claim this change would have been sufficient, it is unclear as a matter of logic that it would have been. *See* note 7 *supra*. In addition to that problem, the legislature apparently wanted to be able to advertise that getting a gear license for the first time in 1973 would not count in any way toward getting an entry permit.

Making those who held no gear licenses before 1973 ineligible to even apply is an obvious way of putting teeth into this program. The restrictions of subsection (d) only applied to initially "distressed fisheries", and not to those fisheries designated by the commission after January 1, 1975. It is interesting to note that once the 1973 gear rush crisis had passed, the legislature relaxed, but did not remove, some of the

harshness of the application restrictions concerned in this appeal. *See* note 1 *supra*. This might indicate that the legislature was attempting to avoid any major increase in licenses granted for the 1973 season itself, in the interests of conservation. That these measures succeeded in cutting the rate of increase from 75% to 23% must be strong evidence that they bear a close and substantial relationship to their purpose.[8] That they were not overly harsh is attested by the fact that a 23% increase was still exceptional. *See* note 6 *supra*.

The legislature's measures do not include all hardship cases and exclude all non-hardship cases. This does not negate the obvious rational basis for the provision. It is not and cannot be required that a legislative measure carve out distinctions with "mathematical nicety." *See Morey v. Doud*, 354 U.S. 457, 463, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). Since at least *West Coast Hotel Company v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), it has been established that great deference will be paid to economic regulation by a legislature in the face of constitutional attack. We are not confronted with a "suspect" or near-suspect classification, *see Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), which might invoke the rigors of a strict over-breadth and underinclusiveness analysis. Moreover, "hardship" is not alone a purpose of the act;[9] "unjust discrimination" also in part comprised a constitutionally permissible "prior use" component fundamental to the state's policy to freeze or reduce these fisheries.[10]

---

8. It is admitted by appellees that some of those involved in the gear rush were individuals who would have eventually sought gear licenses in any case; they were led to apply early because of the pending limited entry bill. Even these represent premature current increases in the number of would-be gear licensees.

9. It is for the legislature, and not the court, to determine whether as a matter of policy

hardship should be given more weight in the granting of entry permits. I notice that in 1975, House Bill No. 351 would have allowed "undue hardship" cases to acquire permits, "[n]otwithstanding any other provision of law . . . ." *See* 1975 House Journal 732.

10. In this regard I must reject the reasoning of *State ex rel. Bacich v. Huse*, 187 Wash. 75, 59 P.2d 1101 (1936). I note that

Finally, the specific date of January 1, 1973, is rationally related to the purposes of the act. The 1972 licensing season was the last one unaffected by a "gear rush" brought on by the limited entry bill. The dramatic increase in gear license applications occurred during the 1973 season. Thus it is rational to take the unaffected 1972 season as the measure of the "prior use" component of the limited entry program. January 1, 1973, as the first day of the 1973 season, is the appropriate day to use in effectuating this purpose.

I would affirm the judgment of the superior court.[11]

this case was decided at the height of the turmoil in the 1930's over judicial deference to economic regulation. I must similarly reject the reasoning of *Bozanich v. Reetz*, 297 F.Supp. 300 (D.Alaska 1969), *rev'd on other ground*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed. 2d 68 (1970). *Bozanich* relied on *Bacich*, and in addition was concerned with Alaska Const. art. VIII, § 15. This section has since been specifically amended so as not to restrict limited entry programs in fisheries.

11. In analyzing the case as I do, I do not reach the issue of whether "administrative convenience" is a proper state purpose should the cut-off date be merely intended to aid in administrative determinations of hardship. The classification involved is not "suspect" or nearly so, *see Reed v. Reed*, 404 U.S. 71, 76–77, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and there is even a rational relationship, however imperfect, between the use of a cut-off date and the determination of "hardship" itself.