Irven R. ROSE, Appellant,

v.

**COMMERCIAL FISHERIES ENTRY
COMMISSION, Appellee.**

No. 5361.

Supreme Court of Alaska.

June 11, 1982.

Olof K. Hellen and Theodora Accinelli, Hellen & Partnow, P.C., Anchorage, for appellant.

Madeleine R. Levy, Asst. Atty. Gen., Anchorage, Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

COMPTON, Justice.

This case concerns Irven Rose's application for a limited entry permit. Rose appeals from the decision of the superior court which upheld a denial by the Commercial Fisheries Entry Commission (CFEC) of eleven contested points. Rose contends that the regulatory scheme under which he was denied these points is in violation of the equal protection guarantees of the Federal and Alaska Constitutions, and that the CFEC wrongfully denied him points under the "special circumstances" and "unavoidable circumstances" provisions in the regulations. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Irven Rose began fishing commercially in 1969, working from then through 1971 in Prince William Sound as a crewman on a purse seine vessel. Together with his son and son-in-law, he purchased the LENA C in 1972 and equipped it for purse seining.

Although Rose intended to engage in Prince William Sound purse seining in 1972, the Alaska Department of Fish and Game ordered the fishery closed for the 1972 season. There was a brief opening in the Coghill district. Rose, however, did not participate in that opening because the Cordova Aquatic Marketing Association requested that its members not participate until it reached an agreement with the fish processors on the salmon catch price.

From 1973 on, Irven Rose fished with the LENA C as a gear license holder and interim use permit holder.

This appeal is the concluding saga in Rose's application for a limited entry permit under Alaska's Limited Fisheries Entry Act. AS 16.43.010–.380. The Act is a set of statutory provisions designed "to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination." AS 16.43.-010(a).

The statutory system was designed to achieve this goal through three stages, with its major element being the requirement that, as of January 1, 1974, anyone operating gear in the commercial taking of fishery

resources must possess an "entry permit." AS 16.43.140(a).[1]

The second phase of the program, the focus of the present controversy, required the CFEC to establish the maximum number of entry permits for each particular fishery. For certain "distressed fisheries," the number is the highest number of units of gear fished during any one of the four years immediately preceding January 1, 1973; for others, the CFEC is to establish the maximum when it finds that participation in that fishery has reached such levels that limitation of entry is required to fulfill statutory purposes. AS 16.43.240. Applicants for such fisheries are limited to prior gear license holders, AS 16.43.260(a), and they have to be ranked by the CFEC according to the degree of hardship which they would suffer by exclusion from the fishery, measured as of January 1, 1973. This is to be accomplished under properly promulgated regulations weighing two main factors: the degree of an applicant's economic dependence on the fishery, and the extent of the applicant's past participation in the fishery. AS 16.43.250. Those suffering "significant economic hardship," as defined by the CFEC, are to be awarded permits even if so doing results in exceeding the maximum number of permits set for that fishery. Any remaining permits are to be issued to applicants in descending order of priority.[2] AS 16.43.270.

Pursuant to the statutory mandate, AS 16.43.250,[3] the CFEC promulgated an elaborate set of regulations designed to assess past participation and economic dependence, based upon a forty-point scale.[4]

Up to twenty points may be awarded for past participation. An applicant may qualify for points by having participated during the particular year either as a crewmember or as a gear license holder. As a crewmember, the applicant receives one point per year, for years 1965–1972. As a gear license holder, the applicant may obtain points for 1960–1972, with the later years weighted more heavily. For 1971 and 1972, an applicant is awarded three points per year for having participated at all, and an additional two points if that participation was "consistent"—i.e., lasted a certain minimum number of weeks, determined from a table in the regulations. For 1969 and 1970, applicants may be awarded two actual participation points and one consistent participation point for each year. For earlier years, one point per year is awarded.[5] 20 AAC 05.630(a), (c).

1. This case does not concern either the first phase, the issuance of interim use permits (AS 16.43.210(a)), or the third phase, the CFEC's administration of the "buy-back" program (AS 16.43.290–.330).

2. If, within the lowest priority classification at which permits are issued, there are more applicants than permits within that class, the distribution is to be by lottery. However, the commission shall issue permits to all qualified applicants if the total number of permits issued for the fishery does not exceed the maximum number established for that fishery by more than five percent or 10 permits, whichever is greater. AS 16.43.270(b).

3. AS 16.43.250 provides:
(a) Following the establishment of the maximum number of units of gear for a particular fishery under AS 16.43.240, the commission shall adopt regulations establishing qualifications for ranking applicants for entry permits according to the degree of hardship which they would suffer by exclusion from the fishery. The regulations shall define priority classifications of similarly situated applicants based upon a reasonable balance of the following hardship standards:
(1) degree of economic dependence upon the fishery, including but not limited to percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, investment in vessels and gear;
(2) extent of past participation in the fishery, including but not limited to the number of years participation in the fishery, and the consistency of participation during each year.

4. The 40-point scale applied to the Prince William Sound purse seine fishery. For some fisheries the CFEC uses an alternative 24-point scale. See 20 AAC 05.653. This has no application to the instant case.

5. However, an applicant can only be awarded participation points for 1960–1964 if he participated as a gear license holder at least one year during the period 1965–1972. 20 AAC 05.630(a)(3).

Economic dependence is also measured on a twenty-point scale. Ten of these points reflect availability of alternative occupations and investment by the applicant in vessel and gear. The remaining ten points are based on the applicant's income dependence on the fishery during 1971 and 1972. The applicant must have been a gear license holder to qualify for these points. The points are determined from a table given in the regulations, based on the ratio of the applicant's fishery income to total income. The year 1972 is weighed more heavily, determining six points as compared to the four points at stake for 1971. 20 AAC 05.630(b), (c).

The CFEC properly recognized that strict application of the regulatory point system would not in all instances fairly gauge "the hardship which [an applicant] would suffer by exclusion from the fishery." AS 16.43.-250(a). To ameliorate the inequities which inevitably would arise were the point system applied in a blind manner, the CFEC authorized the award of discretionary points. One regulation, 20 AAC 05.-630(b)(2), provides that "special circumstances" points are available where an applicant's income dependence on the fishery is not fairly reflected by application of the point system.[6] Similarly, 20 AAC 05.-630(a)(5) provides that "unavoidable circumstances" points are available where an applicant's past and consistent participation points are not fairly indicative of an applicant's actual history of participation in the fishery.[7]

Thus, the maximum possible award is forty points.[8] The CFEC established twenty points as the level at which an applicant would suffer "significant economic hardship" if excluded from the fishery, and thus would be entitled to a permit even if awarding permits to all at that level would result in exceeding the maximum. 20 AAC 05.640(a).

The particular year at issue in this case is 1972. In most fisheries, this was the most important year in the regulatory scheme, determining three participation points, two consistent participation points, and six income dependence points. The regulations, though, also provide that "[a]ll eligible applicants for any designated fishery will receive 0 points for any year in which there was an administrative closure for the entire season." 20 AAC 05.650(a). Thus, due to the administrative closure of the Prince William Sound purse seine fishery in 1972, the point system had to be amended in order to identify the relative hardship of applicants for a Prince William Sound purse seine permit. Although there is some confusion between the parties on this point, it appears that the CFEC dealt with the 1972 closure differently for 1972 participation points and 1972 income dependence points. No 1972 participation points were awarded to any applicant for the Prince William Sound purse seine fishery (including those who had participated in the Coghill opening). 20 AAC 05.630(c)(1). This was an across-the-board denial, with no substitute of an alternate year.[9] For income dependence points, however, the CFEC did not

---

**6.** 20 AAC 05.630(b)(2) reads:

[I]f special circumstances exist such that an applicant's income dependence is not realistically reflected by his income dependence percentage for the years 1971 and 1972, the commission may award an applicant up to a maximum of 10 points based on a special showing of income dependence.

**7.** 20 AAC 05.630(a)(5) provides:

[I]f unavoidable circumstances exist such that an applicant's past participation in the fishery is not realistically reflected by points awarded for past participation for the years 1960 through 1972, the commission may award an applicant up to a maximum of 16

points upon a special showing of past participation during the years 1960 through 1972.

**8.** *See* note 4, *supra.*

**9.** Originally, it appears, both parties labored under the misapprehension that the denial was not uniform, since some applicants had been awarded points for participating in the brief Coghill opening. However, the CFEC's current position is that no applicant, including the Coghill participants, are entitled to points for the 1972 Prince William Sound purse seine season. Apparently this has been consistently applied, with one exception, which the CFEC admits was in error.

simply deny points; it substituted 1971 for 1972 and 1970 for 1971 in its calculations. 20 AAC 05.630(c)(2).

In Rose's case, he, along with all other Prince William Sound purse seine applicants was awarded no participation points for 1972. As to income dependence, Rose also received zero points, because he had not been a gear license holder in 1971 or 1970, having obtained a gear license for the first time in 1972.

Rose, however, claimed five points for past participation and consistent participation in the Prince William Sound purse seine fishery for 1972 under the "unavoidable circumstances" exception, 20 AAC 05.-630(a)(5), and six points for income dependence during 1972 based on the "special circumstances" exception, 20 AAC 05.-630(b)(2). The CFEC denied these disputed eleven points, principally because 20 AAC 05.650(a) precludes the award of points for any year in which a fishery is closed.

It is unclear from the record whether the minimum point level for the Prince William Sound purse seine fishery was fifteen points or seventeen points. Regardless, Rose's final award as determined by the CFEC was twelve points.[10] Thus, the eleven contested points are crucial to Rose's status, as they resulted in a denial of Rose's application.

## II. EQUAL PROTECTION

We first address whether the regulatory response to the administrative closure of the Prince William Sound purse seine fishery in 1972 deprived Rose, and others who first held a gear license in 1972, of equal protection of the law as guaranteed by the United States and Alaska Constitutions. The relevant components of the regulatory scheme are 20 AAC 05.650(a), which provides that no points can be awarded an applicant for any year in which a fishery is closed, 20 AAC 05.630(c)(1), which precludes an award of participation points for 1972, and 20 AAC 05.630(c)(2), which substitutes 1970 for 1971 and 1971 for 1972 in calculating income dependence points.

In assessing equal protection challenges under the United States Constitution, courts employ either the "rational basis" test or the "compelling state interest" test, depending on the basis of the classification or the nature of the affected interest. In the present case, Rose does not submit that the pertinent regulations reflect a suspect classification or that his interest in acquiring a limited entry permit constitutes a fundamental right. Indeed, in both *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976) and *Commercial Fisheries Entries Commission v. Apokedak*, 606 P.2d 1255 (Alaska 1980), two seminal cases raising equal protection challenges to the Limited Entry Act, we noted that the interest affected by the Act, the availability of employment opportunity, is judged by the "rational basis" standard. *See also, Application of Urie*, 617 P.2d 505, 509 n.7 (Alaska 1980). Moreover, since the intensified rational basis test adopted in Alaska subjects legislative classifications to greater scrutiny than the federal rational basis test, we think it appropriate to limit our discussion to whether the challenged regulations satisfy the state equal protection standard. *Williams v. Zobel*, 619 P.2d 448, 457 (Alaska 1980) (Zobel II), *prob. juris noted*, 450 U.S. 108, 101 S.Ct. 1344, 67 L.Ed.2d 331 (1981).

■ The focus of our inquiry under the Alaska equal protection analysis is whether the legislative classification is a reasonable means to accomplish a legitimate state purpose.[11] We discussed the mandated linkage between legislative means and purposes in *Isakson v. Rickey* :

---

10. The CFEC did modify its original award of nine points by allowing an additional three points for investment in vessel and gear. The three points were originally denied because Rose owned the vessel and gear jointly with his son and son-in-law, and thus was only entitled to partial points. However, in light of the fact that the other two co-owners were not eligible to apply and claim the remaining points, the CFEC awarded the full amount to Rose. That portion of the decision is not before us.

11. *See Pharr v. Fairbanks N. Star Borough*, 638 P.2d 666, 669 (Alaska 1981); *Hilbers v. Municipality of Anchorage*, 611 P.2d 31, 39–41 (Alaska 1980); *Isakson v. Rickey*, 550 P.2d at 362.

Under the rational basis test, in order for a classification to survive judicial scrutiny, the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'

550 P.2d at 362, *quoting State v. Wylie*, 516 P.2d 142, 145 (Alaska 1973). The dispositive issue, therefore, is whether the regulatory scheme bears a fair and substantial relationship to the legitimate purposes of the Limited Entry Act.

■ One legitimate purpose of the Limited Entry Act is to "prevent unjust discrimination by allocating permits according to the degree of hardship which a person would suffer by exclusion from the fishery." [12] *Commercial Fisheries Entry Commission v. Apokedak*, 606 P.2d at 1266. The regulations in dispute plainly bear a fair and substantial relationship to that purpose. The year 1972 was an aberrational year. As a result of the administrative closure of the fishery, it would have been impermissibly speculative for an applicant's experience in 1972 to afford any basis from which the CFEC could meaningfully identify relative hardship. The regulation denying points to an applicant for any year in which a fishery is closed (20 AAC 10.650(a)) thus serves a reasonable, if not essential purpose. Further, it is apparent that any resultant regulatory response to the closure necessarily provided a basis to draw distinctions between applicants, the very purpose of the point system. Indeed, were no "classifications" or distinctions drawn among the

pool of applicants for a Prince William Sound purse seine permit, the relative ranking would not vary. [13] Viewed in this context, we think it manifestly reasonable for the CFEC to determine that as a result of the closure, no "1972" participation points would be awarded, but that a prior year would be substituted for purposes of calculating economic dependence points. That the regulatory response adopted by the CFEC operated to the detriment of applicants who first intended to hold a gear license in 1972 does not necessarily render the classification invalid. Rose, and others similarly situated, essentially lost a chance to change status—from crewmember to gear license holder. In contrast, applicants who held gear licenses in prior years suffered an actual loss. We recognized in *Apokedak* that "the deprivation of the opportunity to change status is quite different from the loss of a status previously acquired." 606 P.2d at 1266. Having suffered a greater loss, applicants who held gear licenses in years prior to 1972 warranted a greater award of points. The point system adopted by the CFEC properly reflects such a distinction.

The allocation of a limited economic resource—here, a limited entry permit—necessarily requires the creation of a system of classification. Among the various modes of classification, a system may be purely random, or it may, as here, seek to identify in some objective manner a prioritized ranking of applicants. While this court subjects any such classification to scrutiny to assure that the system is consistent with the equal protection clause of the Alaska Constitution,

12. We identified in *Apokedak* the following as legitimate purposes of the Limited Entry Act:

(1) enhancing the economic benefit to fishermen since too many involved in the industry prevented those relying on fishing for a livelihood from securing adequate renumeration;
(2) conserving the fishery;
(3) avoiding unjust discrimination in the allocation of a limited number of entry permits, by allocating those permits according to the degree of hardship which a person would suffer by exclusion from the fishery; and
(4) administrative convenience.

606 P.2d at 1265–66 (paraphrased).

13. Rose notes that although the relative ranking would have remained the same had the CFEC awarded all 11 points to those willing and able to participate during 1972, more applicants, including himself, would have achieved 20 points and would thus automatically receive permits. This argument challenges any distinction between Prince William Sound purse seine applicants and applicants from other fisheries. What happened in other fisheries during 1972 is not relevant to Rose's case because it is against other fishermen in Prince William Sound, and not elsewhere, that Rose is being measured.

we remain mindful that the legislature enjoys broad discretion when distributing scarce economic benefits. To require a reasonable nexus between legislative means and ends is not to demand perfection in classification. "If it did, there would be few laws establishing classifications that would sustain an equal protection challenge." *Commercial Fisheries Entries Commission v. Apokedak*, 606 P.2d at 1267. Viewed in this light, the CFEC's regulatory response to the administrative closure was only one of several available options. It is clear that Rose may have fared better had the CFEC responded to the closure differently. Yet it is equally clear that none of the other options are significantly more fair or more substantially related to the statutory purposes.

The CFEC in this case promulgated a regulatory system which, although it affects applicants who first held a Prince William Sound gear license in 1972 adversely, furthers in a fair and substantial manner a proper and preeminent goal, the allocation of a limited number of permits without unjust discrimination. We therefore conclude that the regulatory response to the administrative closure of the Prince William Sound purse seine fishery in 1972 does not violate the equal protection clause of the Alaska Constitution.

## III. UNAVOIDABLE AND SPECIAL CIRCUMSTANCE POINTS

Rose also argues that the CFEC should have awarded him a total of eleven points under the "special circumstances" [14] and "unavoidable circumstances" [15] provisions. At issue is whether an administrative closure of a fishery, which deprives an applicant of the opportunity to fish and thus, indirectly, of the opportunity to qualify for an award of points, constitutes a "special" or "unavoidable" circumstance within the context of the regulatory system.

Rose's position on appeal is untenable for two reasons, either of which, in our view, is sufficient to uphold the denial of both "unavoidable" and "special" circumstance points.

The principal argument advanced in the CFEC decision was that 20 AAC 05.650(a) denied all points to an applicant for any year in which there was an administrative closure for the entire season. The CFEC reasoned that this regulation has precedence over both provisions concerning the availability of discretionary points. In this regard, the relevant portion of the CFEC decision provided:

When regulations governing application for the Prince William Sound purse seine fishery for salmon were adopted following a period for public comment, the Commission believed that fishery to fall under 20 AAC 05.650(a), granting 0 points for any year in which there was an administrative closure for the entire season. Consequently, related regulations such as 20 AAC 05.630(c)(1) and (2) dealing with consistent participation and income dependence for 1972 in the Prince William Sound purse seine fishery do not allow points to be received.

We agree. "One indication whether an agency has proceeded in the manner required by law is compliance with its own regulations." *Jager v. State*, 537 P.2d 1100, 1108 (Alaska 1975); *see Mukluk Freight Lines, Inc. v. Nabors Alaska Drilling, Inc.*, 516 P.2d 408 (Alaska 1973). Pursuant to 20 AAC 05.650(a), no applicant in the Prince William Sound purse seine fishery could receive any points for the year 1972. To countenance the award of discretionary points, under the guise of labeling the administrative closure a "special" or "unavoidable" circumstance, renders 20 AAC 05.-650(a) meaningless. As a consequence, neither "unavoidable circumstances" points or "special circumstances" points are available for any hardship resultant from the 1972 administrative closure of the Prince William Sound purse seine fishery.

On appeal, the CFEC sustains the denial of discretionary points by arguing that both the "unavoidable circumstances" and the

---

**14.** 20 AAC 05.630(b)(2) is set forth at note 6, *supra.*

**15.** 20 AAC 05.630(a)(5) is set forth at note 7, *supra.*

"special circumstances" provisions comprehend only those particularized occurrences which affect an applicant uniquely.[16] Absent the requisite showing of non-universality, an applicant is not entitled to an award of discretionary points. The CFEC thus submits that the 1972 closure of the Prince William Sound purse seine fishery affected all participants similarly, and that, consequently, the administrative closure cannot serve as the basis for an award of either "unavoidable" or "special" circumstance points.

We note at the outset the limited scope of our review. Two related inquiries are at issue—the CFEC's interpretation of the "special circumstances" and the "unavoidable circumstances" provisions, and the CFEC's ultimate determination that Rose's particular factual circumstances did not merit the award of discretionary points.

■■■ An agency's interpretation of its own regulation presents a question of law.[17] We have oftentimes noted that the deferential "reasonable basis" standard of review is appropriate where a question of law implicates the agency's expertise as to complex matters or as to the formulation of fundamental policy. *Compare Weaver Bros., Inc. v. Alaska Transportation Commission*, 588 P.2d 819, 821 (Alaska 1978) (reasonable basis) *with State, Commercial Fisheries Entry Commission v. Templeton*, 598 P.2d 77, 80 (Alaska 1979) (independent judgment). *See generally Jager v. State*, 537 P.2d at 1107 (Alaska 1975); *Kelly v. Zamarello*, 486 P.2d 906, 916–17 (Alaska 1971). In addition, where an agency interprets its own regulation, as in the present case, a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue. K. Davis, Administrative Law Treatise § 7.22, at 105–08 (2d ed., 1979). Rose's assertion

that the interpretation of "special" and "unavoidable" requires no particular expertise to the contrary, we think it plain that the determination of the parameters of the discretionary point provisions is an integral part of the more general process of assessing an applicant's relative hardship if excluded from the fishery. This process, expressly delegated to the CFEC by the legislature, entails both administrative expertise and the formulation of fundamental policy. As the superior court observed, this process "will not lightly be interfered with by this court." Accordingly, our inquiry is limited to determining whether there is a reasonable basis to the Commission's interpretation of the regulations.[18]

It follows, further, that once the interpretation of the regulations is resolved, the Commission's application of the "law" to the particular factual circumstances presented by Rose is a matter committed to the Commission's sound discretion. Consequently, "our scope of review is limited to whether the decision was arbitrary, unreasonable or an abuse of discretion." *State, Department of Administration v. Bowers Office Products, Inc.*, 621 P.2d 11, 13 (Alaska 1980) *quoting, North Slope Borough v. LeResche*, 581 P.2d 1112, 1115 (Alaska 1978).

Rose first submits that an interpretation of "unavoidable" to include some notion of uniqueness distorts the commonly understood meaning of "unavoidable." The evolution of the "unavoidable circumstances" provision, 20 AAC 05.630(a)(5), however, supports the Commission's interpretation. Formerly both provisions pertaining to the award of discretionary points provided that such points could be awarded for "special" circumstances. The provision pertaining to the award of discretionary past participa-

---

**16.** We address this alternative argument because it has general applicability to future CFEC proceedings.

**17.** *United States v. RCA Alaska Communications, Inc.*, 597 P.2d 489 (Alaska 1978).

**18.** In prior cases where an agency's interpretation of a regulation was at issue, we employed

a deferential standard of review. *United States v. RCA Alaska Communications, Inc.*, 597 P.2d 489, 498 (Alaska 1978) (interpretation entitled to great weight); *State, Dep't of Highways v. Green*, 586 P.2d 595, 602 n.21 (Alaska 1978) (interpretation given effect unless plainly erroneous).

tion points was amended in April of 1975 (Reg. 54, Apr. 7, 1975) to read "unavoidable" circumstances. The Commission has consistently distinguished between the ambit of "special" and "unavoidable." The following passage from CFEC File No. 75–28 (Aug. 4, 1975) is illustrative:

> The word 'special' implies connotations different from that of 'unavoidable,' particularly in light of the regulatory amendment to Section 630(a)(4) [sic], which changed the term 'special' to 'unavoidable' while not at the same time changing the term 'special' as used in section 630(b)(2). By its nature, 'special' implies a broader set of circumstances than does the term 'unavoidable', since it assumes that the usual has not occurred, or conversely, that something unusual has occurred. The regulation does not specify that the circumstances be a result of unavoidable conditions.

As the quoted passage reflects, the amendment to 20 AAC 05.630(a)(5) was intended to narrow the circumstances under which past and consistent participation points would be awarded. We conclude, therefore, that it is reasonable for the Commission to interpret "unavoidable" to include some notion of "special." For an occurrence to qualify as an "unavoidable circumstance," that situation must be both "special" and "unavoidable" as those terms are understood within the context of the regulations.

In the present case, the administrative closure of the Prince William Sound purse seine fishery in 1972 undeniably made Rose's non-participation unavoidable.[19] It was not, however, a "special" or "unique" situation. The closure affected all participants in the fishery similarly, and was specifically provided for in the regulations by a provision which denied participation points to all applicants.

Thus, we think the CFEC's interpretation of "unavoidable" is reasonable, and its discretion not to award past or consistent par-

ticipation points on the basis of the "unavoidable circumstances" provision should be upheld.

Rose next argues that even accepting that the "special circumstances" provision encompasses an element of uniqueness or nonuniversality, the 1972 closure affected first-year license holders, like himself, in a fashion different than other participants in the fishery. Rose, in essence, argues that the 1972 administrative closure was "special" because when coupled with the Commission's decision to substitute 1971 for 1972 and 1970 for 1971 in determining an applicant's "economic dependence" on the fishery, first-year gear holders were affected in a uniquely adverse manner. Rose, along with other first-year gear holders, did not qualify for an award of economic dependence points pursuant to this system because in the substituted years, 1970 and 1971, he was not a gear license holder.

In large part, Rose's disagreement with the Commission's interpretation of what constitutes "special circumstances" merely restates the equal protection argument addressed previously. It would indeed be anomalous to hold that the Commission's regulatory response to the 1972 administrative closure did not deprive first-year gear holders of equal protection of the law, yet at the same time hold that the Commission must award discretionary "special circumstances" points to these very same parties out of concern for the disproportionate impact of the regulations.

We conclude that the administrative closure of the fishery had universal effect. No purse seining was allowed and, consequently, no economic dependence (or participation) points were awarded for 1972. *See* 20 AAC 05.650(a). The cumulative effect of the administrative closure and the Commission's resultant regulatory response does not transpose an occurrence of universal effect, the administrative closure, to a "spe-

---

**19.** Both parties agree that Rose's failure to participate in the Coghill opening was not rele-

vant. *See* note 9, *supra.*

cial circumstance" warranting the award of discretionary points.

We acknowledge, in this regard, that Rose derived a substantial portion of his income from the fishery in the years surrounding 1972.[20] Yet, Rose's failure to obtain an award of economic dependence points is not directly attributable to the closure of the fishery in 1972. That Rose may well have received economic dependence points had the fishery not been closed is irrelevant. No parties received economic dependence points to reflect the income they could have derived from the fishery in 1972. Rose's failure to obtain points for either 1970 or 1971 is due solely to the fact that he did not then hold a gear license, and like all other crewmen employed in the fishery, he thus did not qualify for an award of economic dependence points. It is equally clear that Rose's income dependence in 1973 and 1974 has no bearing on the award of economic dependence points.

We conclude, therefore, that it was reasonable for the CFEC to deny Rose an award of "special circumstances" points.

The judgment of the superior court is AFFIRMED.

RABINOWITZ, C. J., dissents.

20. The applicable percentages are:

| | |
|---|---|
| 1970 | 71% |
| 1971 | 90% |
| 1972 | 73% |
| 1973 | 97% |
| 1974 | 98% |

1. "The dominant law clearly is that an agency must either follow its own precedents or explain why it departs from them." 2 K. Davis, Administrative Law Treatise § 8:9, at 198 (2d ed. 1979).

2. The CFEC hearing officer put forward a definition of "special" in his recommended decision indicating that the term encompasses only one type of situation beyond the scope of the term "unavoidable," *i.e.*, the so-called "calendar year" exception. It applies to

   applicants [who] had minimal contact with commercial fishing until 1972. During 1972 they ceased their non-fishing work and relied almost exclusively on commercial fishing

RABINOWITZ, Chief Justice, dissenting.

I dissent from the court's holding that it was reasonable for the CFEC to deny Rose an award of "special circumstances" points.

20 AAC 05.630(b)(2) reads:

[I]f special circumstances exist such that an applicant's income dependence is not realistically reflected by his income dependence percentage for the years 1971 and 1972, the commission may award an applicant up to a maximum of 10 points based on a special showing of income dependence[.]

Initially, the CFEC's brief takes the position that "special" means "unavoidable." This is plainly inconsistent with the many adjudications in which it has indicated that "special" has a broader meaning than "unavoidable." Although one early decision (CFEC File 75–1) equated the two terms in dicta, it has apparently been superseded by the numerous subsequent decisions distinguishing the two terms. The CFEC's position on appeal on this point seems at odds with its almost completely consistent pronouncements in the past (except for File 75–1), and is totally unsupportable.[1]

I think that, whatever definition of the term "special" is adopted,[2] Rose's situation presents a "special" situation regarding income dependence points. The applicable percentages are as follows:

through the remainder of 1972 and into 1973 and 1974. Because their income dependence percentage was initially calculated for the calendar year 1972 it was quite low, but as of the qualification date of January 1, 1973, it was over 90%. The calendar year method of calculating income dependence percentage was not a realistic reflection of the applicant's true dependence on the fishery. 6 points were therefore awarded.

The Commission itself was apparently concerned about this narrowing of the definition of "special," as it specifically requested that Rose's attorney respond to the hearing officer's recommended decision with some discussion of these definitions. As the Commission explicitly changed its ground of decision on this point from the hearing officer's recommended decision, it apparently disagreed with his formulation of the definition of the term "special," but its decision casts no light on whether it considered the "calendar year" exception to be the only respect in which its definition of "special" is broader than its definition of "unavoidable."

| | |
|---|---|
| 1970 | 71% |
| 1971 | 90% |
| 1972 | 73% |
| 1973 | 97% |
| 1974 | 98% |

For Rose to receive no points with his record of economic dependence is simply not defensible. This unjust result does not stem solely from the administrative closure of the Prince William Sound purse seine fishery in 1972, but from 20 AAC 05.650(a) coupled with 20 AAC 05.630(b) and 20 AAC 05.630(c)(2). Rose is prevented from receiving any points for his 73% dependency in 1972 by the operation of 20 AAC 05.650(a), which denies points for any year in which a fishery is closed for an entire season. As noted, the CFEC substituted 1971 for 1972 for purposes of income dependency. However, Rose is equally unable to receive any points for his 90% dependency in the substituted year because, not having been a gear license holder in 1971, he can claim no points for income dependence.

I think that this paradoxical result was not contemplated by the regulations, and surely meets the definition of "special circumstances," even under the most restrictive definition. It was, as far as I can tell from this record, unavoidable; nothing Rose could have done, including participating in the Coghill opening against the Association's wishes, would have prevented this result.[3] It is also non-universal. Far from affecting all PWS purse seine fishers alike, as does the outright denial of past and consistent participation points, this differentiates between those who first acquired a gear license in 1972 and those who already had one in 1970.[4] Although awarding the latter group more points makes sense in the area of past and consistent participation points, it does not make sense when the question is one of economic dependence as of January 1, 1973.

I thus conclude that the CFEC had no reasonable basis for denying Rose some measure of income dependence points.[5]

Under the regulations, the CFEC has discretion to award up to ten points for "special circumstances." For the Prince William Sound purse seine fishery, the following points levels are set by the tables:

For 1970: if applicant was 90% dependent, 4 points

if applicant was 60% dependent, 2 points

For 1971: if applicant was 90% dependent, 6 points

**3.** The CFEC's position is that, even had Rose participated in the Coghill opening, it would not award him any points, under 20 AAC 05.650(a).

**4.** I think that this adverse classification of Rose does not amount to an equal protection violation justifying the invalidation of one or more of the regulations which combine to have this peculiar effect; but I think it cannot be denied that they treat Rose differently than other Prince William Sound purse seine fishers, to his disadvantage. It is this "non-universality" which distinguishes this situation from the denial of past and consistent participation points. The latter impacted equally on all Prince William Sound purse seine applicants. Here, the CFEC has removed points from all applicants, thereby treating them all equally; but it has then further provided for a substitute year, which impacts unequally on those who had no gear license in 1970 and thus can be awarded no income dependence points.

**5.** The CFEC's own decisions provide for more flexibility in administering the "special circumstances" income dependence points than in administering the "unavoidable circumstances" past and consistent participation points.

> Past participation, by its nature, must be measured in historical terms, since it is achieved only by actually fishing. The only evidence of past participation is past participation. Economic dependence, and more particularly income dependence, is a more fluid notion that may be interpreted in strict historical terms, as for example the applicant's income dependence in 1971 and 1972 or by some other method. The statutory intention to measure income dependence as of January 1, 1973 *may* be more accurately achieved by some other method if the strict historical method fails to accurately reflect a particular applicant's actual dependence as of January 1, 1973.

CFEC File No. 75–28 (emphasis in original). This fluidity is, I believe, another reason why "special circumstances" income dependence points should more easily hurdle the barrier of 22 AAC 05.650(a), whereas "unavoidable circumstances" past participation points may not.

if applicant was 60% dependent, 3 points

20 AAC 05.630(b)(1), (c)(2).

Since the CFEC substituted another year for 1972, thereby depriving Rose of any recognition of income dependence points because he only acquired his gear license in 1972, I think that the income percentage of the year substituted, 1971, ought to be regarded as if earned during 1972. This would result in an additional 6 points for Rose, which entitles him to a permit.

I thus conclude that there was no reasonable basis for the denial of "special circumstances" points to Rose.[6]

**6.** I will reserve for a more appropriate occasion comment upon the court's apparent sub silentio interment of the balancing element of Alaska's equal protection test. *See Williams v. Zobel*, 619 P.2d 448, 457 n.30 (Alaska 1980); *State v. Erickson*, 574 P.2d 1, 12 (Alaska 1978).