Alan L. YOUNKER, Appellant,

v.

ALASKA COMMERCIAL FISHERIES
ENTRY COMMISSION, Appellee.

No. 4145.

Supreme Court of Alaska.

Aug. 3, 1979.

918

Richard J. Riordan, Jr., Bradbury & Bliss, Inc., Anchorage, for appellant.

Peter B. Froehlich, Jon Tillinghast, Asst. Attys. Gen., and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, Chief Justice, CONNOR, BOOCHEVER and BURKE, Justices, and DIMOND, Senior Justice.

## OPINION

BOOCHEVER, Justice.

In 1973, the Alaska Legislature passed the Limited Entry Act, AS 16.43, for the purpose of regulating and controlling entry into the commercial fisheries "in the public interest and without unjust discrimination."[1] The Act established the Commercial Fisheries Entry Commission (hereinafter "Commission"), which was given authority to "adopt regulations establishing qualifications for ranking applicants for entry permits according to the degree of hardship which they would suffer by exclusion from the fishery."[2] In 1974, the Commission promulgated a priority classification point system.[3]

Alan Younker, appellant, applied to the Commission for a Prince William Sound drift gill net entry permit in 1975. Younker claimed 19 points in his initial application.[4] The Commission's initial review verified 15 points.[5] Younker requested and received a hearing before one of the Commission's hearing officers. At that hearing, Younker claimed that he was entitled to 36 points.[6] The hearing officer recommended classifying Younker with 15 points. After a hearing before the full Commission, the Commission adopted the hearing officer's recommendation. Younker appealed to the superior court, which affirmed.[7] He now appeals to this court. We affirm.

Alan Younker and his brother, Michael, came to Alaska in 1969 with the intent to enter the state's fisheries. Alan worked as a school teacher to finance what the brothers viewed as essentially a partnership enterprise. Michael devoted his efforts to preparation for entry into the fisheries, working primarily on vessels and gear.

The brothers arrived in Alaska after the deadline for obtaining gear license permits for the 1969 fishing season. That fall, the two of them made a down payment of $500.00 on the *Copper Belle*, a vessel whose hull was in need of repair. After determining that the hull was too rusted to repair, they abandoned their efforts and forfeited the down payment. The Younkers never used the *Copper Belle* in Alaska's fisheries. In 1970, the brothers purchased a second vessel, the *Capelin*, which was located at the bottom of Valdez harbor. They raised the vessel and spent the 1970 fishing season repairing it. In 1971, they sold the *Capelin* and bought the *Linda Marnell*. In 1971, the brothers found that they did not have enough time to prepare the *Linda Marnell* for both gill netting and purse seining. Since purse seining was more lucrative, they opted to forego gill netting. In 1972, the Younkers took the *Linda Marnell* and a handcrafted skiff and entered the gill net fishery in Prince William Sound. On the voyage to deliver the catch from the first two-and-one-half day period, the *Linda Marnell* sank and all the fish were lost. Immediately, Alan and Michael acquired the *Bifbia II*, which they outfitted for use in the gill net fishery. The brothers' catch

1. AS 16.43.010(a).

2. AS 16.43.250(a).

3. 20 AAC 05.600–.666.

4. Younker claimed 3 points for participation as a gear license holder in 1972, 6 points for ownership of a vessel or gear, 4 points for availability of alternative occupations, and 6 points for income dependence in 1972.

5. The Commission verified all the points claimed by Younker, *see* note 4, *supra,* except the 6 for income dependence. In addition, the Commission, on its own, granted 2 unclaimed points for consistent participation in 1972, bringing the verified total to 15 points.

6. Before the hearing officer, Younker claimed 11 additional points for participation in 1969, 1970 and 1971 pursuant to 20 AAC 05.630(a)(5) [unavoidable circumstances] and up to 10 points for income dependence pursuant to 20 AAC 05.630(b)(2) [special circumstances]. [Bracketed material added]
   Prince William Sound gill net entry permits were being issued to all applicants having 20 or more verified points. *See* 20 AAC 05.-640(a).

7. Younker's appeal to the superior court included a complaint for declaratory relief, seeking invalidation of the classification system, 20 AAC 05.600–.666; Younker lost on the issues raised in his complaint as well as on his appeal.

in the drift gill net fishery was very small. They converted the *Bifbia II* to purse seining and spent the remainder of the 1972 season using purse seine gear.

## PAST PARTICIPATION POINTS

■ Alan Younker urges that his preparations for fishing in 1969, 1970 and 1971 should qualify as past participation in the fishery. Younker bases his argument on AS 16.43.250(a)(2), which provides that in awarding permits on the basis of "hardship," the Commission shall consider, as one factor, the applicant's "past participation in the fishery, including but not limited to the number of years participation in the fishery, and the consistency of participation during each year."[8] Alan claims that the "including but not limited to" language embraces his preparatory efforts. The Commission defines "past participation" as "harvest[ing] the fishery resource commercially . . . ." 20 AAC 05.610(1). The Act does not define "past participation," but the only form of past participation made rele-

vant to the determination of hardship under the Act is participation "in the fishery." AS 16.43.250(a)(2). The Legislature has defined "fishery," for purposes of the Act, as "the commercial taking of a specific fishery resource in a specific administrative area with a specific type of gear." AS 16.43.380(3). Thus, the Commission's definition of past participation coincides with the legislative view that hardship be measured according to the actual taking of fish in the past. Even if the "including but not limited to" language of AS 16.43.250(a) allows the Commission to expand upon the concept of participation, it does not require it to do so. We agree with the Commission that it was not required to give Younker participation points for years in which he did not fish.

■ We need not consider Younker's argument that the preferential treatment afforded gear license holders in the award of past participation[9] and economic dependence[10] points frustrates the purpose of the

8. In full, AS 16.43.250(a) provides:

Following the establishment of the maximum number of units of gear for a particular fishery under § 240' of this chapter, the commission shall adopt regulations establishing qualifications for ranking applicants for entry permits according to the degree of hardship which they would suffer by exclusion from the fishery. The regulations shall define priority classifications of similarly situated applicants based upon a reasonable balance of the following hardship standards:

(1) degree of economic dependence upon the fishery, including but not limited to percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, investment in vessels and gear;

(2) extent of past participation in the fishery, including but not limited to the number of years participation in the fishery, and the consistency of participation during each year.

9. 20 AAC 05.610 provides:

The standard of past participation in the fishery includes the number of years participation in the fishery and the consistency of participation. The commission will determine an applicant's extent of past participation as of the qualification date established under AS 16.43.260(d) or (e), and will apply the above two factors as follows:

(1) the commission will rank an applicant based on the number of years participation

by considering the number of years the applicant has harvested the fishery resource commercially while participating as a gear license holder and his number of years participation as a crewman, with greater weight being given to participation in recent years as a gear license holder;

(2) the commission will rank an applicant based on consistency of participation by considering the number of weeks of the season in which the applicant harvested the fishery resource commercially while participating as a gear license holder. This factor will be given less weight than the number of years of participation.

10. 20 AAC 05.620 provides in part:

The standard of economic dependence upon the fishery includes a consideration of percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, and investment in vessels, gear and set net sites. The commission will determine an applicant's economic dependence as of the qualification date established under AS 16.43.260(d) or (e) and will therefore give primary weight to evidence from the years immediately preceding the qualification date and will consider the above four factors as follows:

(1) the commission will rank an applicant based on the two factors of percentage of income derived from the fishery and reliance on

Act and discriminates against him. Younker has shown no injury from this preference.[11]

## EQUAL PROTECTION

■ Younker's constitutional challenge to the point classification system has two bases: that it unjustly discriminates against applicants who were not gear license holders in the years preceding the Limited Entry Act, and that it unfairly discriminates against those fishermen who elected to work during the off season. Younker has no personal stake in the outcome of his first claim; he did not lose points because he lacked a gear license, but because he did not participate in or depend on the fishery.

His second equal protection challenge fares no better. He attacks the Commission's income dependence percentage[12] on the ground that it unfairly discriminates against fishermen who worked at alternative jobs in the off seasons in 1971 and 1972 and invested those earnings into the fishery. The Legislature enacted several criteria for assessing economic dependence, which, along with past participation, measures the hardship which would result from exclusion from the fishery. These criteria include "percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, [and] investment in vessels and gear; . . . ." AS 16.43.250(a)(1). The Commission did no more than to enact points for these factors.

■ Younker does not allege that any federally recognized fundamental right or suspect classification is implicated by the challenged regulations.[13] The test we apply in our equal protection analysis is, therefore, the one we delineated in *State v.*

on alternative occupations by considering the relation between "annual catch value" and "nonfishing occupational income," expressed as an "income dependence percentage" as these terms are defined in sec. 660 of this chapter. Points for income dependence will be awarded only to applicants who harvested the fishery resource commercially while participating as a gear license holder during a year in which income dependence is claimed. A higher income dependence percentage indicates a higher degree of economic dependence upon the fishery;

.    .    .    .    .

11. If anything, Younker benefited from the gear license preference. The preference divides fishermen who have participated in the fishery into two classes: those with gear licenses and those without. The number of those holding gear licenses is less than the total number of those participating in the fisheries. Younker represents a third class: those not participating at all. Younker's failure to qualify for points under 20 AAC 05.610 and 20 AAC 05.620 is the result of his failure to "[harvest] the fishery resource commercially," rather than his failure to hold a gear license. If he had established his past participation under 20 AAC 05.630(a)(5) (unavoidable circumstances) or his income dependence under 20 AAC 05.630(b)(2) (special circumstances), he would have been treated as though he held a gear license and would have competed for a permit against a smaller class

of applicants than he would have without the gear license preference. The preference therefore does not discriminate against Younker.

12. 20 AAC 05.620(1) provides that:

[T]he commission will rank an applicant based on the two factors of percentage of income derived from the fishery and reliance on alternative occupations by considering the relation between "annual catch value" and "nonfishing occupational income," expressed as an "income dependence percentage" as these terms are defined in sec. 660 of this chapter. .    .    .

20 AAC 05.660(2) defines "income dependence percentage" as "the annual catch value divided by the sum of the annual catch value and the nonfishing occupational income, with the result multiplied by 100." For example, if Younker's annual catch value was $13,-000.00 and his occupational income was also $13,000.00, his percentage would be fifty [$13,000 ÷ ($13,000) + ($13,000) = .5 or 50%].

13. *State v. Erickson,* 574 P.2d 1, 11 (Alaska 1978), states:

In cases involving federal constitutional questions, where fundamental rights and suspect categories are at issue, we are bound by the "compelling state interest" standard unless that test is altered by the United States Supreme Court.

*Erickson,* 574 P.2d 1, 11–12 (Alaska 1978). In *Erickson,* we explained and reiterated our earlier decision in *Isakson v. Rickey,* 550 P.2d 359 (Alaska 1976), in which we held that classifications challenged on equal protection grounds

> must be reasonable, not arbitrary, and must rest upon some ground of difference *having a fair and substantial relation to the object of the legislation,* so that all persons similarly circumstanced shall be treated alike.

*Id.* at 362 (footnote omitted, emphasis added), *quoting State v. Wylie,* 516 P.2d 142, 145 (Alaska 1973). In *Erickson,* we further explained that this

> test will be flexible and dependent upon the importance of the rights involved. Based on the nature of the right, a greater or lesser burden will be placed on the state to show that the classification has a fair and substantial relation to a legitimate governmental objective.

574 P.2d at 12.

■ The point scheme is reasonable and not arbitrary.[14] It provides for consideration of all the factors which the Legislature thought relevant to economic dependence. The income dependence percentage bears a fair and substantial relation to the object of the Act. It would seem axiomatic that an applicant with a higher income dependence percentage has a greater degree of dependence on the fishery for income, and would therefore tend to suffer greater hardship by exclusion than would an applicant with a lower income dependence percentage, who has a greater reliance on alternative occupations and is less dependent on the fishery. If income from alternative occupations is invested into the fishery, the applicant receives recognition of that investment by being awarded points for ownership of vessels and gear. It cannot reasonably be argued that the percentage of income derived from the fishery is substantially unrelated to the hardship an applicant would suffer by exclusion from the fishery. The regulations complained of are not facially unconstitutional.

■ Younker received six points (the maximum)[15] for his investment in gear and vessels. He received four points (again, the maximum)[16] for unavailability of alternative occupations, notwithstanding the fact that he was employed as a schoolteacher. He argues, however, "that the Commission's 'income dependence percentage' creates an irrebuttable presumption that all nonfishing income is evidence of *reliance* on alternative occupations." Younker claims that because he invested more money into the fishery than he received from teaching, he cannot be held to have relied on his teaching income. The argument is specious. Plainly, Younker was at least partially dependent on his teaching or other nonfishing income for survival, since he was not supporting himself by fishing.[17] The regulations do not discriminate unfairly against Younker as applied.

## UNAVOIDABLE CIRCUMSTANCES POINTS

The regulations provide:

[I]f unavoidable circumstances exist such that an applicant's past participation in the fishery is not realistically reflected by points awarded for past participation for the years 1960 through 1972, the commission may award an applicant up to a maximum of 16 points upon a special

---

14. We do not intimate any view as to the constitutionality of the gear license requirement of the income dependence regulations. As Younker's problem is not the absence of a license, but rather the absence of income from fishing, that requirement did not affect his application.

15. *See* 20 AAC 05.630(b)(3).

16. *See* 20 AAC 05.630(b)(4).

17. After the *Linda Marnell* sank, the Younkers obtained the *Bifbia II* and reentered the gill net fishery for a short period of time. They also seined in 1972. Younker's gross income from the fisheries in 1972 was $5,228.00, but the record is unclear as to how much of that was from gill netting and how much was from purse seining.

showing of past participation during the years 1960 through 1972; . . .
20 AAC 05.630(a)(5).

■ Younker claims that the Commission abused its discretion in denying him past participation points due to unavoidable circumstances in 1969, 1970 and 1971. There was no evidence that Younker made any attempt to enter the fishery before the end of the 1969 season. He and his brother did not purchase the *Copper Belle* until September or October of that year. There would be no basis for awarding points for 1969. The Younkers did not fish in 1970. Instead they worked on the *Capelin,* which they had salvaged from the bottom of Valdez Harbor. The hearing officer recommended that Younker receive past and consistent participation points for purse seining in 1970,[18] but not for gill netting. The hearing officer's reasoning was that, while work on the boat would explain the one-year delay of Younker's entry into the purse seine fishery, there was no unavoidable circumstance that prevented Younker from participating in the drift gill net fishery in 1971. Younker did not enter the gill net fishery until 1972 and he passed up the gill net season in 1973. There is substantial evidence to support the finding that, while Younker "had some degree of intention to eventually enter the drift gill net fishery, he did not have a specific unequivocal intention to fish in any given year until 1972." In 1971, the Younkers, having disposed of the *Capelin,* bought the *Linda Marnell.* Because Alan Younker was teaching, he had insufficient time to prepare this vessel for both gill netting and purse seining. Since purse seining was more lucrative, he passed up the gill net season in 1971. The circumstances surrounding his failure to gill net in 1971 were not unavoidable. He could have quit his teaching job and entered the

gill net fishery on the *Linda Marnell.* Instead, he made his election to forego gill netting. While it may have been a sensible election, it was not the only one available to him. Again, the evidence supports the hearing officer and the Commission.

## SPECIAL CIRCUMSTANCES POINTS

Section 20 AAC 05.630(b)(2) provides that:

> [I]f special circumstances exist such that an applicant's income dependence is not realistically reflected by his income dependence percentage for the years 1971 and 1972, the commission may award an applicant up to a maximum of 10 points based on a special showing of income dependence; . . .

■■ Younker claims that the Commission abused its discretion by not awarding him income dependence points for 1972 under the special circumstances regulation. Younker's boat sank after the first two days of fishing in 1972. He received past and consistent participation points for 1972 under the unavoidable circumstances provision.[19] In order to qualify for income dependence points under the special circumstances regulation, Younker needed to show that his "income dependence percentage"[20] would have been 50 or above.[21] In other words, Younker would have to have grossed as much money fishing as he did teaching. In 1972, Younker earned $13,039.00 as a school teacher. The hearing officer concluded that Younker would not have qualified for income dependence points even if he had completed the 1972 fishing season. This finding was based, in part, on data showing that less than six percent of the boats gill netting in the Prince William Sound area in 1972 grossed more than $13,-

---

**18.** In fact, Younker holds a purse seine entry permit.

**19.** *See* 20 AAC 05.630(a)(5), set forth on page 14 *supra.*

**20.** The income dependence percentage is computed according to the formula set forth in 20 AAC 05.660(a). *See* note 12 *supra.*

**21.** The minimum percentage for income dependence points for applicants seeking drift gill net permits in the Prince William Sound is set at 50 for 1972. *See* 20 AAC 05.630(c)(2).

000.00.[22] The hearing officer's conclusions were accepted by the Commission. Younker claims that the Commission should have taken the catch value of the fish he caught before the *Linda Marnell* sank, estimated by him to be $7,000.00, and multiplied that figure by the number of periods he would have fished, which he claims to be four. We find this argument unpersuasive. First, we note that half the catch belonged to Younker's brother. Second, since the boat sank, there was no way to verify the value of the catch. Third, Younker presented no evidence to buttress his assertions that many of the 489 licensed participants in the 1972 fishery "no doubt participated in only a small part of the season . . . [or were] recreational fishermen and others who were not seriously seeking to maximize their harvest." Similarly, there was no evidence that the Copper River Flats area was, as Younker claims, any more productive than the rest of Prince William Sound. Finally, Younker did not allege or show that his income in other years followed the formula he suggests. He had the burden of showing that special circumstances affected his income dependence percentage. In the absence of any evidence to support his claim, there was no abuse of discretion by the Commission in adopting the finding that he would not have been likely to achieve a 50 percent income dependency by gill netting the entire season.

The judgment of the superior court is AFFIRMED.

MATTHEWS, J., not participating.

---

22. In his recommendation, the hearing officer detailed other factors supporting the denial of income dependence points:

Considering that the applicant was fishing from a skiff and would have continued doing so through the early part of the season, that the applicant intended to use some of the available gillnetting time to participate in the purse seine fishery, that their return from gillnetting on Vessel D [the *Bifbia II*] was minimal, and that 1972 was the applicant's first year in the drift gill net fishery, I do not believe that the applicant would have grossed anywhere near $13,039 had Vessel C [the *Linda Marnell*] remained fishing.