Steve COPELAND, Appellant,

v.

STATE of Alaska, COMMERCIAL FISHERIES ENTRY COM-MISSION, Appellee.

No. S–12275.

Supreme Court of Alaska.

Sept. 21, 2007.

Michael Hough, Homer, for Appellant.

Laura C. Bottger, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, BRYNER, and CARPENETI, Justices.

### OPINION

FABE, Chief Justice.

This appeal arises out of the Commercial Fisheries Entry Commission's (CFEC's) de-

---

1. *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992).

2. *Simpson v. State, Commercial Fisheries Entry Comm'n,* 101 P.3d 605, 609 (Alaska 2004).

3. *Id.* (quoting *Lauth v. State,* 12 P.3d 181, 184 (Alaska 2000)).

4. *Jones v. Commercial Fisheries Entry Comm'n,* 649 P.2d 247, 249 n. 4 (Alaska 1982).

nial of a limited entry fishing permit to Steve Copeland. Copeland applied for and was denied a limited entry permit in the Prince William Sound Purse Seine salmon fishery. He appealed the denial to the superior court, which affirmed CFEC's decision to deny the permit.

When the superior court acts as an intermediate court of appeal, we independently review the merits of the administrative decision.[1] When reviewing an agency's interpretation of its own regulation, we apply the reasonable basis standard.[2] We defer to the agency unless its "interpretation is 'plainly erroneous and inconsistent with the regulation.'"[3] When reviewing a decision based on factual findings, we apply the substantial evidence test.[4]

After a careful review of the parties' briefs and arguments, we concur in the superior court's determination that CFEC's regulatory interpretations were reasonable and that its factual findings were based on substantial evidence. Because the court's thoughtful decision on appeal correctly upheld CFEC's determination, we adopt the superior court's decision, attached as an appendix, in its entirety. Because that decision does not separately address Copeland's claim for past participation points as distinct from his claim for special circumstances income dependence points, we briefly address that issue.

CFEC's regulations provide for an award of past participation points based on a showing that "unavoidable circumstances" prevented an applicant from participating in the fishery.[5] Copeland contends that CFEC abused its discretion when it refused to award him past participation points for crewman participation in 1970. He claims he did not participate in 1970 due to domestic prob-

---

5. 20 Alaska Administrative Code (AAC) 05.630(a)(5) provides:

> [I]f unavoidable circumstances exist such that an applicant's past participation in the fishery is not realistically reflected by points awarded for past participation for the years 1960–1972, the commission may award an applicant up to a maximum of 16 points upon a special showing of past participation during the years 1960–1972....

lems and appears to suggest that he should have been granted "unavoidable circumstances" points. In its final decision, CFEC noted that Copeland had offered testimony that he did not participate in 1970 because of a poor prediction for the fishery and because he was doing well in another fishery. CFEC reasoned that Copeland's decision not to participate "may have been a sound business decision" but concluded that Copeland failed to establish that circumstances beyond his control prevented participation.

In *Alaska Commercial Fisheries Entry Commission v. Russo*, we noted that the unavoidable circumstances clause "requires both uniqueness and unavoidability." [6] Based on these requirements, we upheld a CFEC interpretation "limiting application of the clause to cases where fishermen are prevented from fishing by circumstances beyond their control." [7] In *Younker v. Alaska Commercial Fisheries Entry Commission*, we upheld CFEC's denial of unavoidable circumstances points to an applicant who did not participate in a gillnet fishery.[8] We reasoned that the applicant's circumstances were not unavoidable where he elected to pass up gillnetting because purse seining was more lucrative.[9] The applicant's choice "may have been sensible," but "was not the only one available to him." [10]

As in *Younker*, the record in this case suggests that Copeland made a sensible but avoidable decision not to participate in 1970. Copeland testified in 1976 that he did not participate because "it was just a real poor forecast." The hearing officer asked if there were any other reasons, to which Copeland responded "I did ... very good gillnetting late on the flats .... and, as a rule when it's a good summer season gillnetting, you can make more money doing that than crewing on a seine boat[.]" Copeland offered additional testimony regarding 1970 during his second hearing, in January 1981. He ex-

plained his lack of participation in 1970 as follows:

> Well, for one reason my wife was here and I was gillnetting summer reds on the flats ... and I was doing quite well and my wife was fishing with me. I didn't live in Cordova at the time.... I would have had to ... [send] my wife home [and] .... it would have put a lot of strain on our relationship.... I was doing quite well gillnetting summer reds on the flats and 1970 was a very poor seine season.

Based on Copeland's testimony in 1976 and 1981, substantial evidence supports CFEC's determination that Copeland was not prevented from fishing by circumstances beyond his control.

For this reason and those contained in the superior court's decision on appeal, we AFFIRM the superior court's decision.

EASTAUGH, Justice, not participating.

## APPENDIX

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

### THIRD JUDICIAL DISTRICT AT ANCHORAGE

STEVE COPELAND,

Appellant,

v.

STATE OF ALASKA, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellee.

Case No. 3AN–05–6568 CI

CFEC No. 90–127 A

**Decision on Appeal[1]**

It used to be that anyone with the gear and an attitude could drop a net and seek to harvest salmon in Alaska waters. That changed in 1973, with passage of a law that

6. 833 P.2d 7, 9 (Alaska 1992).

7. *Id.* at 9–10.

8. 598 P.2d 917, 923 (Alaska 1979).

9. *Id.*

10. *Id.*

1. This decision has been edited to comply with the technical rules of the Alaska Supreme Court, and most internal citations have been omitted.

limited entry to those who could prove their past participation and economic dependence upon a specific fishery.[2] A point system was developed[3] to implement these criteria, based on one's fishing history in the years 1960–72. Steve Copeland came up one point short of the 17 necessary to obtain a Prince William Sound purse seine permit, and so appeals. He argues primarily that the Commission erred in its application of the "special circumstances" regulation,[4] and ignored the mandate of an earlier superior court decision.

## Introduction to limited entry and Mr. Copeland's fishing history

There are reasons, not all of them the best, for why this case took 30 years to reach this point. The point system was designed to measure the hardship that a gear license holder would suffer from exclusion from the fishery—those fishing as crew do not need a limited entry permit[5]—and so was complex by nature, and particularly so in this case. Points for the then-recent years of 1971 and 1972 counted more than 1969–70, which in turn offered more possible points than earlier years.[6] But the Prince William Sound purse seine fishery was mostly closed in 1972, so the Commission didn't award points to anyone for that year,[7] on the theory that this would be fair, since it impacted all applicants equally. Mr. Copeland's argument, at least in part, and Judge Madsen's 1980 opinion, is that this didn't quite work in his case, because of the way the Commission interpreted its regulations. A closer look at his actual fishing history is necessary to understand this argument; there are several good statements of this history in the record. (I see no need to review the procedural history in depth, as it is recited at several places in the record and set forth in the briefing.)

Mr. Copeland fished in both the purse seine and drift gillnet fishery with his father in 1963 and 1964, starting around the time he turned 16. (Applications for each of these fisheries are distinct; Mr. Copeland first held a gear license for drift gillnetting in 1965, and he did receive an entry permit into this fishery.) He also crewed in the purse seine fishery in 1965 and 1966. After the 1966 season, Mr. Copeland and Martin Van Slageren got together and purchased an old wooden boat, so they could purse seine together in the years to come, although Mr. Copeland didn't actually hold a gear license in his own name until 1973. The two fished together in 1967, but not in 1968, when Mr. Copeland crewed on board another boat. They then fished together again in 1969, and Mr. Copeland was awarded points for half ownership of the boat. His partner received the extra point for holding the gear license, and no points were awarded anyone for income dependence in that year.

In 1970 Mr. Copeland did not participate in the purse seine fishery and did not receive any points. The reasons for this are discussed extensively in the record, and, unfortunately for Mr. Copeland, this is the year that the Commission chose to award the points that couldn't be claimed in 1972 because the fishery was essentially closed in that year. He sold his seine in 1970, and mostly gillnetted the following year, but he did receive a point for his 1971 participation as a crewman in the purse seine fishery. Appellant was also able to up the three points he received for being half owner of the boat he owned with Mr. Van Slageren to six, based on his full ownership of another skiff, and he successfully defended an attack on the four points he had for the lack of availability of alternative occupations, which turned on exactly where he called home on December 31, 1972. Resolution of these is-

---

2. AS 16.43.010 et seq.; *see especially* §§ .140 and .250. For history and background of the program, see *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976), *superseded on other grounds, Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1261 (Alaska 1980); *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154 (Alaska 1982); and *State v. Ostrosky*, 667 P.2d 1184 (Alaska 1983).

3. *See* 20 AAC 05.600 et seq.

4. 20 AAC 05.630(b)(2).

5. AS 16.43.140(a) & (b).

6. 20 AAC 05.630.

7. 20 AAC 05.650(a).

sues also contributed to some of the early delay in this matter, as did turnover among CFEC hearing officers, the first appeal to superior court, and reconciliation with the various supreme court decisions that were issued during this period. As noted earlier, the cumulative effect of all of this was to leave Mr. Copeland one point shy of the 17 points ultimately determined to be necessary to qualify for a permanent entry permit into the PWS purse seine salmon fishery. Interim use permits are issued to applicants whose cases are still under review and claiming sufficient points to qualify.

### Summary of Mr. Copeland's claim for special circumstances points

For the years in question, there is little doubt that a high percentage of Mr. Copeland's income was derived from the Prince William Sound salmon fishery. But a combination of circumstances—his participation in the gillnet fishery, the intermittent nature of his partnership, the fact that he didn't purse seine in 1970 and the effective closure of the fishery in 1972—have left him without any points in this category. This, he asserts, is unfair; "It is not even arguable that [his] income dependence was 'realistically reflected'[8] by his income dependence in 1970 and 1971."[9] Accordingly, he reasons, he must be entitled to at least one point for income dependence, and of course that is all he needs to obtain a permit.

Mr. Copeland asserts that he is not seeking income dependence points for 1970 or 1971, nor for any other specific year or years. He also states that he is not challenging the denial of points for all applicants in 1972, nor

that *Rose*[10] or *Kalmakoff*[11] were wrongly decided. So while it seems that he wants to hang his hat entirely on the broad language of subsection .630(b)(2), I feel it necessary to go through the cases in a more traditional manner. Before doing so, however, it makes sense to start with Judge Madsen's decision, and Mr. Copeland's contention that the CFEC was estopped from relitigating the issue of whether he is entitled to income dependence points under subsection .630(b)(2).[12]

### Did the 1980 court decision mandate granting income dependence points?

█ Because appellant couched the issue in terms of estoppel, the Commission responded in kind with dicta of dubious value in this context.[13] But Mr. Copeland presented no authority at all in his reply brief, saying only that the CFEC's argument would require a conclusion that Judge Madsen's decision "had no weight or effect, except to the extent that CFEC at least did conduct a hearing," even though it then proceeded to ignore everything he said in his opinion.

█ But the key word may have been contained in the language Mr. Copeland quoted in his opening brief—the issue must have been "resolved by *final* judgment on the merits" (emphasis added). Judge Madsen did not retain jurisdiction, and he *remanded* the matter to the Commission, which means that the decision was not final and could not have been appealed.[14] Now that it is back in court, it is somewhat analogous to *Wolff v. Arctic Bowl, Inc.*,[15] where the supreme court sustained a trial judge's authority to reverse himself after discretionary review of an order granting a new trial

**8.** 20 AAC 05.630(b)(2).

**9.** He quotes *Copeland v. Alaska Commercial Fisheries Entry Comm'n*, 3AN–79–2207 CI (Alaska Super., August 13, 1980).

**10.** *Rose*, 647 P.2d 154.

**11.** *Kalmakoff v. State, Commercial Fisheries Entry Comm'n*, 693 P.2d 844 (Alaska 1985).

**12.** Copeland cites *Chugach Elec. Ass'n v. Regulatory Comm'n of Alaska*, 49 P.3d 246, 250–51 (Alaska 2002).

**13.** The Commission relies on *United States v. Vulcanized Rubber & Plastics Co.*, 178 F.Supp. 723, 726 (E.D.Pa.1959), *aff'd*, 288 F.2d 257 (3d Cir.1961), *cert. denied*, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961).

**14.** Alaska Rule of Appellate Procedure 202(a); *City and Borough of Juneau v. Thibodeau*, 595 P.2d 626, 629 (Alaska 1979), *disavowed on other grounds, State v. Alex*, 646 P.2d 203, 208 n. 4 (Alaska 1982).

**15.** 560 P.2d 758, 763 (Alaska 1977).

was denied, holding that the earlier decision wasn't final.

The doctrine of the law of the case is

not an inexorable command. It merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their powers. Though the power exists to reopen the points of law already decided, it is a power which will necessarily be exercised sparingly, and only in a clear instance of previous error, to prevent a manifest injustice. The doctrine of law of the case is normally a salutary one in the interest of economy of effort and of narrowing down the issues in successive stages of litigation.... [16]

Judge Madsen could have reversed the Commission and ordered that a permit be issued, but he didn't do that. The order to hold a hearing would be meaningless if the outcome was foreordained; it is important to scrutinize the instructions of the court on remand.[17] Those instructions were that Mr. Copeland "should be given a hearing at which he can 'make a special showing of income dependence.'" And, as the Commission points out, there have been a host of arguably applicable supreme court decisions in the past 25 years. Under these circumstances, the Commission was not foreclosed from concluding that Mr. Copeland failed to make a special showing, and this court should review the decision independently. This does not, of course, preclude the adoption of all or a part of Judge Madsen's reasoning on the income dependence issue.

**Evolution of the "special circumstances" doctrine**

Although subsection .630(b)(2) has been in place since the beginning, the Commission's

reasoning in those years started and ended with the idea that you can't *limit* gear if you start awarding all sorts of points to people who didn't have gear licenses. Accordingly, the point system was weighted heavily with this bias; crew members didn't need permits to crew, so income dependence points were only awarded to those who held gear licenses in the most recent years.[18] What the CFEC saw in subsection .630(b)(2) was a way to take care of a gear license holder who broke a leg in 1972, or otherwise had uncharacteristically low earnings that season, even though he or she normally made most of the year's earnings in the designated fishery, as well as other such special circumstances.

But Judge Tom Stewart, upon hearing the plea of Phillip Templeton, looked at the language more broadly, and with reference to the purpose of the legislation, which included an admonition to limit entry "without unjust discrimination." [19] Mr. Templeton fished as an equal partner with his brother. While Phillip Templeton had the gear license in 1970, 1973 and 1974, his brother had the license in 1969, 1971 and 1972, and so received all the income dependence points and consequently the permit.[20] Judge Stewart ruled that subsection .630(b)(2) required that Phillip, too, receive income dependence points, starting a new view of the regulation, with applicants looking to the broad statement that it was "designed to govern all situations not specifically covered by the regulations proper," [21] and the Commission trying to limit the case to its facts of a perfectly equal partnership spanning every year from 1969–74.

In *Chocknok v. State, Commercial Fisheries Entry Commission*,[22] the Commission sought to narrow the possible beneficiaries by using a five-part partnership test, but the

16. *Watts v. Seward Sch. Bd.,* 421 P.2d 586, 618 (Alaska 1966) (Rabinowitz, J., concurring in part and dissenting in part) (internal citations and quotations omitted), *reh'g denied,* 423 P.2d 678 (Alaska 1967), *vacated,* 391 U.S. 592, 88 S.Ct. 1753, 20 L.Ed.2d 842 (1968), *reinstated,* 454 P.2d 732 (Alaska 1969), *cert. denied,* 397 U.S. 921, 90 S.Ct. 899, 25 L.Ed.2d 101 (1970).

17. *Cf. John's Heating Service v. Lamb,* 129 P.3d 919 (Alaska 2006).

18. *See generally Kalmakoff,* 693 P.2d at 851–52.

19. AS 16.43.010(a); *State, Commercial Fisheries Entry Comm'n v. Templeton,* 598 P.2d 77, 81 (Alaska 1979).

20. *Templeton,* 598 P.2d at 79.

21. *Id.* at 81.

22. 696 P.2d 669 (Alaska 1985).

Alaska Supreme Court found that this discriminated against partners who were married to each other, and it again expressed its "disapproval of the arbitrariness inherent in awarding one business partner a permit because he, rather than the other partner, happened as a matter of chance to hold the gear license" while the other did not.[23] Once again, however, the court was looking at a partnership (two, actually) which ran right through the relevant years, including 1971 and 1972.

A third case,[24] decided between *Templeton* and *Chocknok,* did involve a fisherman who didn't participate in 1971 or 1972, and the court's response was a lot like Judge Madsen's two years earlier. Lyle Jones had fished in the Southeast purse seine fishery for 22 seasons, from 1949–1970, but didn't in 1971–72, and so was awarded no points for income dependence. The court cited the broad language contained in *Templeton,* and remanded to the Commission, with instructions for it to set forth its reasoning in the event it concluded that no points should be awarded.

*Jones* was unusual in that the reason he said he couldn't fish in 1971 was because his boat had sunk in 1966,[25] but there was no issue relating to the holding of a gear license, as there is here. In 1985, the court declined to extend the reach of subsection .630(b)(2) to crew members who were not partners.[26] But the brief discussion in *Jones* was not mentioned in Justice Rabinowitz's more thoughtful opinion three years later, leaving us with somewhat of a grey area.

Artemie Kalmakoff fished as a gear license holder from 1960–66, and as a crewman from 1967–72,[27] and his application for special circumstances points was summarily rejected, while Lyle Jones, whose boat sank in 1966 and who stopped fishing altogether in 1970, saw his case remanded for consideration under subsection .630(b)(2).[28] The *Kalmakoff* court struggled to balance fairness with the Commission's fundamental mission, acknowledging that its determination that, "other things being equal," those who held gear licenses in 1971 and 1972 were more likely to suffer hardship by exclusion than those who didn't, was fundamentally true.[29] The court therefore concluded that "the regulations favoring 1971 and 1972 gear license holders are consistent with the statute's purpose," noting that nothing in *Templeton* said otherwise.[30] As noted earlier, the court failed to mention the *Jones* opinion from three years earlier, and the implication in *Jones* that a sufficient reason for not fishing in those years might fit within the special circumstances regulation no doubt spawned the many pages contained in this record addressing exactly why Mr. Copeland didn't in 1970.

Another piece of the puzzle is the decision in *Rose v. Commercial Fisheries Entry Commission,*[31] decided two months before *Jones.* This was also an appeal from Judge Madsen, another Prince William Sound purse seine case, in which the applicant crewed from 1969–71, and then bought a boat in preparation to start operating in his own gear in the ill-fated 1972 season. As we know, there was no real season that year, and Mr. Rose encountered the same difficulty as Appellant; income dependence points were based on 1970–71 rather than 1971–72.[32] The Alaska Supreme Court affirmed Judge Madsen's decision sustaining the CFEC's denial of income dependence points because the applicant didn't have a gear license in 1970 or 1971.[33] Justice Rabinowitz dissented, taking

**23.** *Id.* at 674.

**24.** *Jones v. Commercial Fisheries Entry Commission,* 649 P.2d 247 (Alaska 1982).

**25.** *Id.* at 249, 251; *see Brandal,* 128 P.3d at 737 n. 22.

**26.** *Kalmakoff,* 693 P.2d at 850–55; *see also Brandal,* 128 P.3d at 737 n. 23.

**27.** *Kalmakoff,* 693 P.2d at 846.

**28.** *Jones,* 649 P.2d at 251.

**29.** *Kalmakoff,* 693 P.2d at 853.

**30.** *Id.* at 854.

**31.** 647 P.2d 154 (Alaska 1982).

**32.** *Id.* at 157–58.

**33.** *Id.* at 163.

the broad view that Mr. Rose was in fact income dependent, and that subsection .630(b)(2) should be construed to grant him the points based on his 1971 income, even though he was but a crewman in that year.[34] (Mr. Copeland fished as a crewman in 1971, and in any event disavows the argument that *Rose* was wrongly decided or that he is entitled to income dependence points in 1970 or 1971.)

So by 1985 we have the following interpretations of subsection .630(b)(2):

1. One who fished as an equal partner and is income dependent cannot be denied points based "solely on the fortuitous circumstances of which one held the gear license in two given years";[35]

2. If an applicant wasn't a partner and hadn't fished as a gear license holder prior to 1973, no income dependence points are available, even if plans had been laid to do so in 1972 when the fishery didn't open;[36] but

3. An income dependent applicant, who had long held a gear license and planned to fish in 1971 and 1972 but didn't, is entitled to have the CFEC evaluate his claim.[37]

The question is, where does this leave an applicant, generally income dependent on fishing, who didn't hold a gear license prior to 1973, but was a partner in 1967 and 1969, allegedly planned to fish as a partner in 1970 but didn't, crewed in 1971 and couldn't accrue any points in 1972 because of the closure? Is he like Irven Rose, out of luck because of the combination of his past history and the closure, or Lyle Jones, where the Commission was required to take a hard look at the reasons he didn't fish in the year in which income dependence points were award-

ed? Mr. Copeland of course argues the latter, that his are "particularized occurrences which affect [him] uniquely"; that he has made the "requisite showing of non-universality."[38]

Before going on to consider whether Mr. Copeland did make a showing of unique circumstances that prevented him from purse seining in 1970 as a partner or gear license holder, one caveat should perhaps be given. Appellant has stressed his income numbers in a general way, repeating that he needs only one point for income dependence to secure a permit, and emphasizing the broad language of subsection .630(b)(2), that his income is not realistically reflected by the years 1970 and 1971. While the opinion in *Jones* arguably supports Mr. Copeland's position in part, the Commission's point that *Jones* was remanded only because it had failed to consider the evidence proffered *at all* is correct.[39] There is the statute, the regulation and the cases that interpret these; there is no authority for the notion that a fisher who gets close, who is generally income dependent, who "almost" qualifies, has some sort of aggregate claim.[40] Mr. Copeland's attempt to create such an entitlement is plainly foreclosed by the cases cited. Nor, given the court's explanation of *Jones* in *Dominish*, can it be said that Judge Madsen's order remanding the case to the Commission was solely to determine the number of points to be awarded.

**Were the Commission's findings about 1970 based on substantial evidence?**

■ Remand was ordered in *Jones* for consideration of "the particular factors that caused [him] not to participate in the Southeast fishery during 1971 and 1972."[41] Under Mr. Copeland's theory, and Judge Madsen's decision, this was also required here. The Commission made findings of fact on this

**34.** *Id.* at 164–65 (Rabinowitz, J., dissenting).

**35.** *Templeton,* 598 P.2d at 81.

**36.** *Kalmakoff,* 693 P.2d 844; *Rose,* 647 P.2d 154.

**37.** *Jones,* 649 P.2d 247.

**38.** *Rose,* 647 P.2d at 161.

**39.** *See Dominish v. State, Commercial Fisheries Entry Comm'n,* 907 P.2d 487, 493–94 (Alaska 1995).

**40.** *Id.*

**41.** *Jones,* 649 P.2d at 251; *see also Dominish,* 907 P.2d at 493.

issue, which are to be sustained if supported by substantial evidence,[42] which is such evidence that a reasonable person might accept as adequate to support a conclusion.[43] A reviewing court is not to reweigh the evidence or choose between competing inferences, but just to decide whether a reasonable mind could accept the findings in light of the entire record.[44]

Findings were first made by hearing officer Frank Glass, but Mr. Copeland notes that he supplemented the record with a "critical" affidavit from his ex-wife upon administrative review by the Commissioners. Judge Madsen seemed to assume that "family problems" was a sufficient answer to what happened in 1970—the issue was not directly before him—and Mr. Copeland argues that this is correct. His wife supports that reason, while at the same time noting that he did not have a seine boat ready to go, so that he would have had to crew on another boat, and that he had had a falling out with the skipper with whom he intended to fish. He gillnetted that year, and had a good season. Mr. Copeland, however, summarizes her position as—you go seining and we are divorced.

Appellant makes this last observation in the context of his request for a past participation point for 1970. While one may question whether this is a sufficient reason— should one get rural domicile points if a spouse insists on living in Los Angeles?— there is more to the income dependence claim than this. As we have seen, subsection .630(b)(2) also requires participation as a gear license holder or partner, and so Mr. Copeland must show that aspect of his claim as well, in the face of the fact that he had no boat ready to go, crewed the following year and spent the 1970 season on a drift gillnet boat. As he says, there is rarely only one answer to a question.

And, indeed, Mr. Copeland answered the question many times. At the 1976 hearing, he noted that by 1970 "We'd pretty well given up on the boat. We both decided the best thing to do is to sell the boat for what we could get out of it. We sold the seine that year and split the money...." He went on to explain why he didn't operate gear in the purse seine fishery the following year as well. But he also testified that purse seining would have put a strain on his marriage, and that, coupled with the poor prediction for the purse seiners, led to his decision; he did very well gillnetting. It was also apparent that his first boat was not nearly seaworthy during this period.

The hearing officer discussed this evidence and found the earliest testimony the most convincing. He concluded that the choice between purse seining and gillnetting in 1970 turned on "an ordinary biological variable that affected all prospective participants, and did not amount to an unavoidable circumstance." The seine had been sold, the boat was in poor repair, and the hearing officer concluded that Mr. Copeland had not established that he ever intended to purse seine that year. The Commissioners came to the same conclusion, quoting both Mr. Copeland's testimony and his wife's affidavit. While Appellant may argue with the law and the relevance of the findings, they were adequate to support the conclusion, and therefore constitute substantial evidence.

Mr. Copeland didn't purse seine at all in 1970, and he didn't fish as an operator of purse seine gear in 1971. By 1972 he didn't own a seine, his seine boat was unseaworthy and he'd never used his skiff for seining. So even viewing this case from the *Jones* perspective, as opposed to comparing it to *Rose*, the special circumstances claim fails for lack of proof, both as to the reason he didn't purse seine in 1970, and his alleged intention to do so as a partner or gear license holder.

**42.** *Leuthe v. State, Commercial Fisheries Entry Comm'n*, 20 P.3d 547, 550 (Alaska 2001) (citing *Jones*, 649 P.2d at 249 n. 4).

**43.** *Crivello v. State, Commercial Fisheries Entry Comm'n*, 59 P.3d 741, 745 (Alaska 2002) (citing *Commercial Fisheries Entry Comm'n v. Baxter*, 806 P.2d 1373, 1374 (Alaska 1991)); *Yahara v.*

*Construction & Rigging, Inc.*, 851 P.2d 69, 72 (Alaska 1993); *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978).

**44.** *Doyon Universal Servs. v. Allen*, 999 P.2d 764, 771 (Alaska 2000).

### Does the denial of income dependence points violate the Constitution?

Appellant asserts in his opening brief that the Commission's decision denying all income dependence points denied him both due process and equal protection of the law. He correctly states the framework used in deciding due process claims,[45] but he does not address the risk of erroneous deprivation engendered by the present procedure, nor say anything at all about the government's interest in the procedures used.

As mentioned earlier, Mr. Copeland disavowed several of the more likely arguments, presumably in recognition that they wouldn't quite carry the day, or had previously been rejected. But the broad reading of subsection .630(b)(2) that he suggests is simply too amorphous to apply, and he offers no substitute procedures that would allow the Commission to "seek to identify in some objective manner a prioritized ranking of applicants."[46] I agree with the CFEC that Appellant's argument on this point is so cursory as to be deemed waived.[47]

Similarly, his equal protection analysis attempts to do an end run around the decision in *Rose.* The *Rose* court cited *Apokedak I* on the futility of seeking a perfect point system; if such were required, "there would be few laws establishing classifications that would sustain an equal protection challenge."[48] Mr. Copeland simply was not an established gear license holder in the purse seine fishery; he was a two-time partner, who decided to gillnet in 1970 and fished a crewman in 1971. He was on the edge of an imperfect classification, a modified system of "grandfather rights,"[49] and even an application of the special circumstances regulation failed to push

him over the top. You can't read the *Apokedak* and *Rose* decisions without concluding that Appellant's equal protection argument has already been made and rejected in this context. The gear license requirement and the point system advance the Limited Entry Act's legitimate purposes, and the classifications made in it bear a fair and substantial relation to those purposes.[50]

Mr. Copeland also cites *Deubelbeiss v. Commercial Fisheries Entry Commission,*[51] a decision in which a Cook Inlet drift gillnetter, who was also a point short, successfully challenged the point scheme for the availability of alternative occupations. The Commission had used census districts to roughly divide applicants into groups by population, but Mr. Deubelbeiss argued that Ninilchik, a small village halfway between Kenai/Soldotna and Homer, shouldn't be lumped in with these larger communities, and the supreme court agreed. Justice Rabinowitz dissented, wondering what better device than census districts might be postulated,[52] and Justice Compton concurred on statutory grounds.[53] To the extent that Mr. Copeland argues that AS 16.43.010, requiring that entry be limited "without unjust discrimination," sounds like equal protection, he has a valid point, but this does not obviate the fact that his argument has already been rejected by the court. Again he seeks to recast it here in a broader form, drawing from the language of the earlier superior court decision, but I discern no new grounds for relief on this basis.

### Conclusion

Mr. Copeland also makes a claim for past participation points in 1970. The Alaska Supreme Court long ago held that the "unavoid-

**45.** *See Brandal v. State, Commercial Fisheries Entry Comm'n,* 128 P.3d 732, 738 (Alaska 2006) (citing *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

**46.** *Rose,* 647 P.2d at 159.

**47.** *Dominish* (citing *Gates v. City of Tenakee Springs,* 822 P.2d 455, 460 (Alaska 1991)).

**48.** *Rose,* 647 P.2d at 160 (citing *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1267 (Alaska 1980)).

**49.** *Apokedak,* 606 P.2d at 1267.

**50.** *Id.* at 1268.

**51.** 689 P.2d 487 (Alaska 1984).

**52.** *Id.* at 490–91.

**53.** *Id.* at 491–94.

able circumstances" regulation[54] is not as broad as the "special circumstances" rule,[55] which has already been discussed at length. While one can readily understand why Mr. Copeland chose to gillnet in 1970, there was simply nothing "unavoidable" about the choice,[56] and no error by the CFEC in rejecting the claim.

The decision of the Entry Commission is affirmed. The file will remain in Dillingham through March 31.

Dated: March 6, 2006

/s/ Fred Torrisi
Superior Court Judge

---

**54.** 20 AAC 05.630(a)(5).

**55.** *Rose,* 647 P.2d at 160–62.

**56.** *See Commercial Fisheries Entry Comm'n v. Russo,* 833 P.2d 7 (Alaska 1992).